(No. 39391.— )

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, *vs.*
RICHARD CAIN *et al.,* Appellants.

*Opinion filed Feb. 14, 1967.—Rehearing denied Mar. 27, 1967.*

WARD, J., took no part.

THOMAS P. SULLIVAN, DONALD R. HARRIS, and HARRY
J. BUSCH, all of Chicago, (RAYMOND, MAYER, JENNER &
BLOCK, of counsel,) for appellants.

WILLIAM G. CLARK, Attorney General, of Springfield,
and DANIEL P. WARD, State's Attorney, of Chicago, (FRED
G. LEACH, Assistant Attorney General, and ELMER C. KIS-
SANE, LOUIS B. GARIPPO, MATTHEW J. MORAN and WIL-
LIAM J. MARTIN, Assistant State's Attorneys, of counsel,)
for the People.

Mr. JUSTICE KLINGBIEL delivered the opinion of the
court:

The defendants, Richard Cain, James Donnelly and John
Chaconas, together with one William Witsman were in-
dicted by the grand jury of the circuit court of Cook County
for the crime of conspiracy to commit perjury by testifying
falsely before the grand jury. At a joint trial by jury the

defendants were found guilty, but the jury was unable to reach a verdict as to Witsman. The defendants were each sentenced to the penitentiary for a term of not less than one nor more than three years.

The testimony before the grand jury arose out of an investigation of a burglary of the Zahn Drug Company in which a large quantity of drugs was stolen. A portion of the stolen merchandise was later recovered from a room at the Caravelle Motel and it was this recovery which was the subject of the defendants' testimony before the grand jury. Although the burglary and recovery are not directly involved in this case, some discussion of these events is necessary.

The defendants were members of a special investigations unit of the Cook County sheriff's office. Cain was chief of the unit, Donnelly was a lieutenant, and Chaconas was a detective. The burglary of the drug company occurred over the weekend of October 5, 1963. On January 6, 1964, between noon and 1 P.M., a man came to the Caravelle Motel and asked to rent a room saying that he intended to stay about 10 days. He registered as "John Matheos" of Peoria, signed a registration card bearing No. 6927, and was assigned Room 31. The original registration card was placed in a rack in the front office and a carbon copy was taken to the inner office. On the evening of January 6 the motel was raided by members of the special investigations unit, accompanied by two newspapermen, and a large quantity of stolen drugs was found in Room 31. There was evidence at the trial that at the time of the raid Cain removed the original registration card for Room 31 from the office. At the trial the carbon copy bearing No. 6927 was introduced and a handwriting expert testified that the writing was that of Chaconas. The room clerk testified at the trial that Chaconas was the man who registered for Room 31. The State's evidence at the trial tended to show that Chaconas did not participate in the raid.

Before the grand jury Chaconas swore that he was present when the stolen drugs were recovered and that he was not the man who registered for Room 31. He also testified that at the time of the raid he asked the desk clerk for the registration card for Room 31 but the clerk said he couldn't surrender it. Chaconas testified that he "could have" then copied the information from the original card on to a blank registration card. Cain and Donnelly testified that Chaconas participated in the raid. The indictment for conspiracy to commit perjury was based upon Chaconas's testimony that he did not rent and register for Room 31 and that he was present at the raid and upon the testimony of Cain and Donnelly that Chaconas was present at the raid.

In his opening statement to the jury counsel for the defendants stated that the evidence would show that the Caravelle Motel had two systems of registration. One, using duplicate cards each bearing a different number, was used for legitimate guests; the other, for the use of "hasty guests", used cards which all bore the number 6927. At the trial the room clerk identified the carbon copy of card No. 6927, signed by the man who had rented Room 31. On cross-examination counsel for the defendants produced three registration cards, all bearing the name of the motel and all bearing the number 6927. The room clerk testified that these cards seemed to be identical with the ones used by the motel, but reiterated that all the cards used at the motel were numbered in sequence and that there was only one card numbered 6927.

Thereafter the State called as a witness the president of the American Hotel Register Co., which supplied registration cards for the Caravelle Motel. He testified that in April 1963 his firm sold the motel 10,000 duplicate registration cards numbered 1001 to 11,000. He stated that there were no duplicate numbers and that there was only one card numbered 6927. He then testified that, long after the events

at the motel, and shortly before the trial, counsel for the defendants called him and asked if he could have some samples of Caravelle Motel registration cards, all imprinted with the number 6927. He agreed to supply the cards but refused to print the numbers thereon and thereafter, at counsel's request, he delivered the cards to a member of the sheriff's police. He identified the cards which defense counsel had produced as the cards which he had supplied. Shortly after defense counsel commenced cross-examination of this witness the court excused the jury and, in open court, in the presence of members of the press, accused defense counsel of perpetrating a fraud upon the court and stated that he was going to appoint someone to look into the question of whether counsel was in contempt of court. In further discussion out of the presence of the jury counsel admitted that he obtained the cards and that he had another printer place the number 6927 on all the cards. He stated that his purpose was to show the ease with which cards bearing identical numbers could be obtained. The court repeated his remarks that the cards brought in by defense counsel were frauds and also referred to them as "manufactured evidence" and "phony pieces of evidence".

The following morning counsel for the defendants filed motions for mistrial based upon alleged prejudicial newspaper publicity which had appeared in Chicago papers the previous evening and that morning. The headlines of the newspaper articles were as follows: "DEPUTIES' LAWYER ACCUSED OF FRAUD", "JUDGE ASSAILS FAKE EVIDENCE IN ZAHN TRIAL", "JUDGE ACCUSES CAIN'S ATTORNEY OF GIVING FRAUDULENT EVIDENCE", "CAIN'S LAWYER ADMITS FAKING DEFENSE EXHIBITS", "CAIN'S EXHIBITS PHONY". The articles quoted in detail some of the remarks the trial judge had directed to defense counsel. The court denied the motion for a mistrial but granted defense counsel's request that the jury be polled to determine whether they had seen or read the stories. With the exception of one

juror, all of them denied reading any newspaper accounts of the prior day's proceedings. The eighth juror to be questioned made the following response to the court's questions:

"The Court: Josephine Cherback, have you read any newspaper accounts of the trial?

Juror Cherback: I was reading the paper this morning and saw that large page and I just —

The Court: Did you see what was written on the page?

Juror Cherback: I wouldn't say, you know, I just took glances at different spots.

The Court: Do you have any recollection of what was there?

Juror Cherback: I wouldn't say.

The Court: You didn't read the story, right?

Juror Cherback: No.

The Court: And you have no present recollection of what was said in the headline?

Juror Cherback: The Headline —

The Court: Let me ask you this: Would what you saw in any way effect your verdict in this case?

Juror Cherback: No, No."

At the close of the evidence the court refused to give a defense instruction that the jury should not be influenced by newspaper stories.

The defendants contend that they were deprived of a fair trial by reason of the newspaper publicity and the failure of the trial judge to take adequate steps to protect the defendants from the effects of the articles. The most recent pronouncement by the United States Supreme Court on this subject is found in *Sheppard* v. *Maxwell,* 384 U.S. 333, 362, 16 L. Ed. 2d 600, 86 S. Ct. 1507, 1522:

"From the cases coming here we note that unfair and prejudicial news comment on pending trials has become increasingly prevalent. Due process requires that the accused receive a trial by an impartial jury free from outside influences. Given the pervasiveness of modern communica-

tions and the difficulty of effacing prejudicial publicity from the minds of the jurors, the trial courts must take strong measures to ensure that the balance is never weighed against the accused. And appellate tribunals have the duty to make an independent evaluation of the circumstances. Of course, there is nothing that proscribes the press from reporting events that transpire in the courtroom. But where there is a reasonable likelihood that prejudicial news prior to trial will prevent a fair trial, the judge should continue the case until the threat abates, or transfer it to another county not so permeated with publicity. In addition, sequestration of the jury was something the judge should have raised *sua sponte* with counsel. If publicity during the proceedings threatens the fairness of the trial, a new trial should be ordered."

We have also recently had occasion to consider the problem of prejudicial publicity during the trial of a criminal case. In *People* v. *Brinn*, 32 Ill.2d 232, prejudicial newspaper accounts were published during the trial of the case. The court denied motions for a mistrial and also denied requests for individual examination of each juror outside the presence of the others. We pointed out that the case presented a serious problem of the possible conflict between the fundamental right of a free press and a public trial and the equally basic right of the accused to be tried by a fair and impartial jury. We noted in that case that the trial court admonished the jury at length at the beginning and end of each day of trial as to their duty as jurors to remain free from outside influences and also noted that the trial judge interrogated the jury each day as to their exposure to external influences and the jurors repeatedly denied such exposure. At no time during the trial of that case did the defendants offer any evidence that a juror had seen any of the objectionable headlines. In view of these facts we concluded that the defendant's right to a fair trial and an impartial jury had not been violated.

In *People* v. *Hagel,* 32 Ill.2d 413, the defendant contended that he had been denied a fair trial by reason of newspaper publicity during the trial. We pointed out that defendant never made a motion for a mistrial and also that the trial judge, without request, admonished the jury against reading about or discussing the case and also gave defendant's only requested instruction on outside influences. Because of these circumstances the judgment of conviction was affirmed.

In *People* v. *Malmenato,* 14 Ill.2d 52, the defendant moved for a mistrial because of a prejudicial newspaper article which one juror admitted reading. The court admonished the juror that nothing he had read was evidence against the defendant and told the juror that the newspaper article should not be discussed with the other jurors. When asked whether he could still be a fair and impartial juror he replied in the affirmative. The court gave a written instruction to the jury that nothing appearing in a newspaper could be considered as evidence in the case. We affirmed the judgment of conviction.

In the earlier case of *People* v. *Murawski,* 394 Ill. 236, we reversed the judgment of conviction because of a prejudicial newspaper article published during the course of the trial. In that case there was no evidence that any juror had read the article but we pointed out that the newspaper in question was the only morning paper published in the city of Rockford and that it would be a violent presumption to say that none of the 12 men and women having the intelligence of average jurors would read the only local morning paper.

In *People* v. *Hryciuk,* 5 Ill.2d 176, we sustained the post-conviction judgment which had set aside the original judgment of conviction. In the original trial prejudicial newspaper publicity was published during the course of the trial. It developed that each member of the jury had read some of the newspaper accounts but stated that they had

not allowed themselves to be influenced by anything not heard in the courtroom. In that case the jury was instructed to ignore the newspaper articles and consider only the evidence introduced in the case. In spite of the instruction and the fact that the jurors stated that they would not be influenced by the articles, we held that the defendant had been deprived of a fair trial.

In the present case the newspaper headlines were unquestionably prejudicial to the defendants and contained matters which were not properly subjects for the jury's consideration. The only question is whether the trial judge took adequate steps to protect the rights of the defendants against the prejudicial effect of this publicity. In our opinion he did not. The court's interrogation of the juror who admitted seeing one of the headlines was not a fair and thorough investigation as to whether the juror had read the articles or whether she was prejudiced. The judge's leading questions, "You didn't read the story, right?" and, "And you have no present recollection of what was said in the headline?" seemed designed to elicit responses showing no prejudice in the mind of the juror. When, in response to the last question, the juror replied, "The headline —" the court interrupted her. The juror was not specifically admonished not to discuss the newspaper headline with other jurors and the court refused to give a defense instruction that newspaper articles should not be considered. There was no other instruction on this point.

It is our opinion that the right of the defendants to a fair trial before an impartial jury was denied them by reason of the failure of the trial judge to conduct a meaningful examination of the juror and by reason of his failure to properly instruct the jury. For this reason the judgment of conviction must be reversed and the cause remanded for a new trial. In view of this holding we find it unnecessary to consider the question of whether the evidence was sufficient to establish the defendants' guilt and the other argu-

ments advanced on this appeal. The judgment of the circuit court of Cook County is reversed and the cause is remanded for a new trial.

*Reversed and remanded.*

Mr. JUSTICE WARD took no part in the consideration or decision of this case.