The People of the State of Illinois, Respondent-Appellee, *v.* Robert Stock, Petitioner-Appellant.

(Nos. 54593, 57926 cons.;

First District (4th Division)—November 2, 1973.

Gerald W. Getty, Public Defender, of Chicago, (Elliott M. Samuels and James J. Doherty, Assistant Public Defenders, of counsel,) for appellant in No. 54593.

Michael P. Toomin, of Chicago, for appellant in No. 57926.

Edward V. Hanrahan, State's Attorney, of Chicago, (Robert A. Novelle and Nicholas A. DeJohn, Assistant State's Attorneys, of counsel,) for appellee in No. 54593.

Bernard Carey, State's Attorney, of Chicago, (Kenneth L. Gillis and William K. Hedrick, Assistant State's Attorneys, of counsel,) for appellee in No. 57926.

Mr. PRESIDING JUSTICE DRUCKER delivered the opinion of the court:

Defendant,[1] Robert Stock, was tried before a jury for the offenses of armed robbery and murder. The jury returned a verdict of guilty as to the offense of murder, and judgment was entered on it. Defendant received a sentence of not less than 125 nor more than 150 years. He thereupon filed a notice of appeal from his conviction. While his direct appeal was pending, he filed a petition seeking post-conviction relief. This court stayed the cause of the direct appeal until the post-conviction proceeding could be concluded. At the post-conviction hearing defendant's plea for relief was denied. Appeal was taken from this order of the circuit court. Both defendant's direct appeal and his appeal from the order denying post-conviction relief have been consolidated for review.

## I.

We will first consider defendant's direct appeal. He here asserts that: (1) the evidence adduced at trial failed to prove him guilty beyond a reasonable doubt in that it consisted only of the testimony of a witness which was conclusively impeached and eyewitness identifications that were fatally tainted by improper police procedures; (2) defendant's alibi

---

[1] Although he bears the procedural denomination "petitioner" with regard to his attempt to gain post-conviction relief, Robert Stock, the appellant, shall be referred to as "defendant" throughout this opinion for the sake of consistency.

defense should not have been disregarded because the State's evidence failed to produce a reasonable moral certainty that defendant committed the offense; (3) defendant was deprived of a fair trial by the State's improper cross-examination of his witnesses; and (4) defendant was denied his right to instruct the jury on his theory of defense.

On the evening of March 21, 1968, Paul Truschke was shot and killed during a robbery. His body was found in a cooler at the rear of the A & P supermarket he managed at 3429 West Diversey in Chicago. At trial the State introduced evidence that, on the night in question, as was his custom, Truschke, after closing the store, stopped at a tavern located on the same block. That evening he left the tavern at 7:30 P.M. after having had a couple of drinks. When Truschke was late in returning home, his wife and son drove to the store to ascertain his whereabouts. At approximately 1:30 A.M. on March 22 they discovered that one of the rear doors was unlocked. Truschke's son entered the store, searched it and discovered his father's body.

The State's witness, Lorraine Neurater of 3424 West Parker, testified that at about 7:45 P.M. on March 21, accompanied by her son, Ronald, she entered her garage which is located behind her house. The garage and the A & P border on the same alley, the store being approximately 75 feet east of the garage. Ronald removed their car from the garage and with her beside him in the front seat they proceeded in a westerly direction down the alley. In so doing they passed the rear door of the A & P store. She there saw a man emerge, carrying a cloth sack which looked like a money bag. The man turned, closed the door and walked west down the alley. He was a white man, between five feet four and five feet six inches in height, 145 pounds in weight, with straight black hair. He was wearing a dark three-quarter length car coat, dark trousers and a white shirt. At the end of the alley Ronald turned to the south, the man proceeded north. While making the turn, their car passed within a foot of the man. He looked into the car. The alley was well illuminated with three mercury vapor lamps. The man was wearing neither a hat nor glasses. The man was in the alley for about 30 seconds. She viewed his face for a "split second" both when the man emerged from the A & P and when her car turned out of the alley. The following day, March 22, she and her son were taken by the police to the Belmont Hospital. There she was led to a room and shown a man lying on a bed. She recognized him as the man whom she had seen the previous evening in the alley. On March 23 she went to the Shakespeare Avenue Police Station in order to view a lineup. The "line" was comprised of eight men. Each man was asked to state his name and address. All of them complied with these instructions. Prior to the lineup she had learned

defendant's name. She identified defendant at the lineup as the man she had seen at the hospital and in the alley behind the A & P.

Ronald Neurater testified that when he pulled out of the garage he turned his headlights on high beam in order to see whether there was any glass in the alley. He drove very slowly so as to avoid broken glass. He saw a man emerge from one of the rear doors of the A & P. His mother commented to him about the presence of the man who appeared to be carrying a money bag. As he was turning at the end of the alley his mother cautioned him to exercise care due to the proximity of this man walking down the alley. At this time he saw the man looking into the car. The man was wearing a dark jacket, dark pants and a light shirt. He was about five feet six inches in height, 145 pounds in weight and was slightly built. He observed the man's face for about four or five seconds. The following day he informed the police he had seen someone in the alley behind the A & P but "wasn't exactly sure who it was." He was taken to the Belmont Hospital where he was shown a man. He thought it was the man he had seen the night before but he wasn't positive. On March 23 he was taken to the Shakespeare Avenue Station to view a police lineup. The men in the lineup were asked to identify themselves. He had previously learned defendant's name. He pointed out defendant from the men in the lineup as the individual he had seen in the alley.

Joseph Fillippi testified for the State. On Tuesday, March 19, 1968, two days before the crime in question, he was at a filling station in the area when he was approached by the defendant. One James O'Donnell was also present. The time was between 6:30 and 7:00 P.M. Defendant asked whether he was interested in going on a "score" (*i.e.* an armed robbery) with him. Defendant said it would take place at an A & P on Diversey the following Thursday evening. It was defendant's plan to approach a "guy" as he was closing the store, walk him back into it and have him open the safe. If they were late, defendant said, they would wait for the "guy" at a tavern which it was his habit to frequent. They would then take him back to the store. Defendant said that it might be necessary to "off" (*i.e.* kill) the man since it was possible he could identify him. Fillippi discussed the proposition with O'Donnell. He then told defendant that he would not participate since there was the possibility they would have to kill someone. Fillippi was an inmate of Cook County Jail where he was awaiting trial on five separate armed robbery indictments. He expected a recommendation of leniency from the State's Attorney's office in return for his "truthful testimony" against defendant.

Detective John Motzny of the Chicago Police Department testified that he interviewed defendant in the hospital on March 22 concerning

his activities of the night before. Defendant told him that he had eaten dinner at the Terminal Restaurant and "that was the last he rember [*sic*] of anything until he woke up in the hospital." On cross-examination it was brought out that Motzny had accompanied the Neuraters to the lineup conducted at the Shakespeare Avenue Station. Although the Neuraters identified defendant, he was not charged with murder at that time. It was not until March 25, two days after the lineup, that a complaint charging defendant with murder was executed.

Other prosecution testimony indicated that the distance between defendant's residence and that of the deceased was about two and one-half blocks.

Joseph Munoz testified on defendant's behalf. At 7:30 P.M. on the evening of March 21 defendant accompanied him to the corner of Wilson Avenue and Clark Street in Chicago. Defendant waited at a grocery store while the witness purchased a quantity of heroin. He then picked up defendant and they drove to his home, arriving there between 8:30 and 8:45 P.M. At Munoz's home defendant injected himself with some of the heroin and almost immediately passed out. Assisted by Vincent Tamburi, he attempted to revive defendant but was unsuccessful. At approximately 11:00 P.M. he and Tamburi took defendant to the Belmont Hospital.

When called as a defense witness, Vincent Tamburi corroborated a substantial portion of Munoz' testimony.

Both Munoz and Tamburi were extensively cross-examined about their narcotics addiction. Testimony was heard as to the length of time they had been addicted, their source of supply for illicit drugs and the daily cost of drugs required to sustain their dependence.

Defendant also introduced evidence attempting to discredit the testimony of Fillippi. Fillippi's former cellmate at the Cook County Jail, Richard Johnson, testified that Fillippi had told him he was going to devise a story to implicate defendant in the crime. Johnson said Fillippi gave three reasons for this court of action: (1) to gain revenge against defendant's brother who had informed on him, (2) to obtain leniency from the State when he pleaded guilty to the charges pending against him, and (3) to get part of the $5,000 reward money being offered by the A & P Company. Defendant's employment records were produced indicating that he had been working until 6:30 P.M. on March 19. His sister-in-law, who was employed by the same firm as defendant, testified that after work he drove her to her mother's house where he spent the remainder of the evening.

Defendant, testifying on his own behalf, denied any implication in this offense and denied, as well, having seen Fillippi on March 19. Defendant claimed that he fabricated the story he told Detective Motzny

concerning his activities on the evening of the crime in order to shield Munoz from possible difficulties with the police.

A prosecution rebuttal witness, Detective Ralph Storck of the Chicago Police Department, testified that he had accompanied Lorraine and Ronald Neurater to the Belmont Hospital on March 22. On cross-examination he admitted having told them that they were being taken to see a man who the police thought might be the person they saw the night before.

On this evidence the jury returned a verdict of guilty on the indictment charging defendant with the murder of Paul Truschke.

OPINION

Defendant first contends that the evidence adduced at trial failed to prove him guilty beyond a reasonable doubt. He asserts that, essentially, the only prosecution evidence consists of the eyewitness identifications of him as the man in the alley by Ronald and Lorraine Neurater, identifications which he claims are tainted by suspect police identification procedures, and the testimony of Joseph Fillippi, which he claims was conclusively impeached.

■■ Any identification procedure which is unnecessarily suggestive and conducive to irreparable mistake constitutes a denial of due process of law. (*Stovall v. Denno,* 388 U.S. 293.) Identification procedures in which the suspect is viewed individually are considered inherently suggestive. (*Stovall; People v. Cook,* 113 Ill.App.2d 231, 252 N.E.2d 29.) Clearly, in conducting a one man show-up of defendant at the Belmont Hospital, the police violated the prescriptions of this rule. While special circumstances may justify the use of procedures of this nature (*People v. Blumenshine,* 42 Ill.2d 508, 250 N.E.2d 152) no such exigency was here shown. This lack of urgency is underscored by the ability of the police to place defendant in a full station house lineup the following evening. The suggestive nature of the hospital confrontation was compounded by the fact that the police officer who accompanied the Neuraters to it told them prior to their viewing of defendant that they were being shown an individual who might be the man they saw in the alley the night before.

■■ However, even though the one man show-up was improper and the lineup conducted the following night might be so deemed as well, we find that the Neuraters' in-court identification of defendant was based upon observations independent of and uninfluenced by any identification procedures used by the police. Rather than a mere fleeting glimpse of the suspect, as defendant asserts, the record indicates that the Neuraters had ample opportunity to observe him and to remember what they had observed. Their attention was drawn to the man in the alley twice, first

when he emerged from the rear of the store and then again when their vehicle came within inches of striking him. His presence in the alley was sufficiently noteworthy to draw comment from Mrs. Neurater on the fact that he was carrying a money bag. Under excellent lighting conditions, they were able to view the man's face when he looked into their car as they were turning. They could recall in detail the man's manner of dress. On these facts we feel that the identification of defendant was based upon the Neuraters' independent recollection.

It is also defendant's contention that the testimony of Joseph Fillippi was attended by such serious infirmities that its probative value was destroyed. His basic claim is that Fillippi was a paid informer whose testimony was impeached by defense witnesses. Fillippi, who was incarcerated on five separate indictments charging him with armed robbery, admitted on cross-examination that prior to testifying he had had several conversations with representatives of the State's Attorney's office. They promised him that in disposing of the charges pending against him, some consideration would be recommended in return for his "truthful testimony" concerning defendant. In addition, defendant called his former sister-in-law, her mother and Fillippi's former cellmate to impeach Fillippi's testimony concerning his service station meeting with defendant.

■■ It has long been the rule that in a criminal trial bias may be shown by demonstrating that a prosecution witness is himself under indictment. (See *People v. Halpin*, 276 Ill. 363, 114 N.E. 932; *People v. Golliday*, 20 Ill.2d 29, 169 N.E.2d 263; *People v. Velez*, 72 Ill.App.2d 324, 219 N.E.2d 675.) Here defendant was able on cross-examination to fully explore Fillippi's conversations with members of the State's Attorney's office regarding his pending prosecution for armed robbery. However, the mere fact that Fillippi had reason to curry favor with the State's Attorney does not render his testimony inherently incredible. Likewise, the mere presence of contradictory testimony does not conclusively impeach that given by Fillippi. "It is well established that the question of the credibility of witnesses and the weight to be given their testimony is for the jury." (*People v. Wollenberg*, 37 Ill.2d 480, 484, 229 N.E.2d 490; *People v. Calcaterra*, 33 Ill.2d 541, 213 N.E.2d 270.) The basic assertions found in Fillippi's testimony, such as the date and time of the crime, the deceased's habits after completing work and the close proximity of the residences of the deceased and defendant giving rise to the possibility that they knew one another, were corroborated by other evidence. On the basis of this record we can find no reason to overturn the jury's verdict.

■■ In sum, it is our belief that positive eyewitness identification of defendant placing him at the scene of the crime on the evening of its com-

mission, coupled with testimony as to his plan for carrying out the robbery, provides a sufficient evidentiary foundation to sustain a finding that the defendant was guilty beyond a reasonable doubt.

■■■ Defendant next contends that his alibi defense should not be disregarded because the State's evidence failed to produce a reasonable moral certainty that he committed the offense. He asserts the prosecution's evidence was unreliable while the testimony given by Joseph Munoz and Vincent Tamburi given on his behalf must be accepted as credible. We disagree. It is for the jury and not a reviewing court to determine the weight and credibility to be given alibi testimony. Its mere presence does not obligate the trier of fact to disregard the State's evidence to the contrary nor will this court substitute its judgment for a jury's solely because the evidence is in conflict. (*People v. Brown*, 52 Ill.2d 94, 285 N.E.2d 1; *People v. Soukup*, 41 Ill.2d 94, 242 N.E.2d 158.) Both Munoz and Tamburi admitted that they were narcotics addicts. This admission, rather than bolstering their credibility as defendant asserts, in reality requires that their testimony be the subject of closer scrutiny. (*People v. Crump*, 5 Ill.2d 251, 125 N.E.2d 615.) Furthermore, their account of defendant's actions on the night of the crime conflicts with that which he gave to the police while he was hospitalized. We therefore must leave undisturbed the jury's assessment of the credibility of defendant's alibi witnesses.

Defendant claims that the State's cross-examination of Munoz and Tamburi concerning their use of narcotics was improper. Although the court below questioned the need of the prosecutor to pursue this line of inquiry in great detail, the record is bare of any defense objection. The failure to make a proper objection to the admission of evidence or to move to strike it out constitutes a waiver of the right to argue these points for the first time on appeal. (*People v. De Kosta*, 132 Ill.App.2d 691, 696, 270 N.E.2d 475; see also *People v. McCorry*, 51 Ill.2d 343, 282 N.E.2d 425; *People v. Trefonas*, 9 Ill.2d 92, 136 N.E.2d 817.) Furthermore, it should be noted that it was defendant who on direct examination first raised the question of these witnesses' drug use. It is an elementary rule of evidence that a witness in a criminal prosecution may be cross-examined upon any matter tending to explain, modify or discredit what has been said on direct examination. (See *People v. Bey*, 42 Ill.2d 139, 246 N.E.2d 287; *People v. Sevastos*, 117 Ill.App.2d 104, 252 N.E.2d 745.) Since it was defense counsel who first opened the door to this inquiry, the questions asked by the Assistant State's Attorney were properly within the scope of cross-examination.

■■■ Defendant finally contends that it was improper for the trial court to refuse his instructions on the subject of alibi and identification

evidence. It is recommended in I.P.I. Criminal, par. 3.15, that no instruction be given on the subject of identification. It is suggested that this subject is adequately covered by the credibility of witness instruction of paragraph 1.02. Where instruction No. 1.02 is given with instruction No. 2.03, covering the presumpting of innocence and the State's burden to prove defendant guilty beyond a reasonable doubt, the subject of identification is adequately covered. (*People v. Fox*, 48 Ill.2d 239, 269 N.E.2d 720.) In the case at bar both of these instructions were given. Similarly, I.P.I. Criminal, par. 24.05, which specifically deals with the question of alibi instructions, maintains that alibi is not an affirmative defense and that, therefore, no instruction should be given on this matter since instructions should avoid commenting on particular types of evidence. (See *People v. Poe*, 48 Ill.2d 506, 272 N.E.2d 28, *cert. denied*, 404 U.S. 942.) Thus there was also no error in the trial court's refusal to give defendant's proposed instructions on this topic.

The judgment (Appeal No. 54593) is affirmed.

## II.

On appeal from the denial of his post-conviction motion defendant claims that: (1) he was denied due process of law in that the State suppressed material evidence which was favorable to his case; and (2) his right to a fair trial was abridged by the unfair tactics utilized by the prosecution.

■■■ In denying defendant's request for post-conviction relief, the court below entered a comprehensive written opinion. In it the facts adduced at the hearing on defendant's petition were digested and valuated. Taking cognizance of the principle that at a post-conviction hearing the burden is on the defendant to show a denial of a constitutional right by a preponderance of the evidence, (*People v. Evans*, 37 Ill.2d 27, 224 N.E.2d 778; *People v. Moore*, 42 Ill.2d 73, 246 N.E.2d 299) we find the determination of the circuit court to be correct and therefore adopt its opinion. It is herein reproduced:

"This Court has reviewed: 1. the Petition, affidavits and papers filed with the instant Petition; 2. all of the testimony of the 11 witnesses who testified at, and the exhibits admitted in, the instant hearing; 3. the transcript of the testimony at the original trial of the witnesses whose testimony in any way, directly or indirectly relate to the allegations of the instant Petition.

Based on the review of the entire record and the opportunity to observe and determine the credibility of each of the witnesses, this Court does hereby find:

1. Petitioner Robert Stock was at all time during the original

trial represented by counsel of his own choice, Norman Nelson, Jr. This Court observed during the course of said trial, Nelson was an experienced, competent and well prepared attorney.

2. Testimony concerning the early evening of *March 19, 1968*, and the alleged conversation at *Ernie's Gas Station* was presented to the *trial jury* by the following witnesses:

*On behalf of the State—Respondent*

Joseph *Fillippi*. He testified both in the direct and rebuttal stage of the case and was extensively cross examined.

*On behalf of Stock—Petitioner*

James O'Donnell

Richard Johnson

Ronald Stock

Robert Stock

In this connection, it is to be noted that jury had before it from the aforesaid witnesses, the following facts as to said conversation:

A. *Fillippi* as a state witness testified that on March 19, 1968 between 6:30 and 7:00 p.m. at a Mobile gas station at Elston and Belmont Avenue, Chicago, he met and had a conversation with *Stock* re: the A & P grocery store 'score'. Also present at the station was James *O'Donnell*.

B. *O'Donnell* as a witness on behalf of *Stock* admitted on cross examination that on March 19, 1968, he was present with Fillippi at Ernie's gas station on Elston and observed Fillippi and Stock talk about ten or fifteen minutes.

C. Richard *Johnson* called by Stock testified *Fillippi* told him in May, 1968 at the County Jail that he was devising a story to implicate Stock in the A & P store robbery; that *Johnson* and *Stock* were then residing in the same tier at the jail.

D. *Maureen Stock*, then the sister-in-law of Stock, testified on behalf of *Stock* that on *March 19, 1968*, she and petitioner *Stock* left work together at *6:30 p.m.*, drove to 2711 West Wellington, did not stop at any gas station and after arriving at the Wellington address, the defendant-petitioner did not leave the house that evening.

E. *Robert Stock* testified at the trial that on *March 19, 1968*, he left work around 6:30 p.m., drove directly to a Mrs. Flood's home (Mother of Maureen Stock), went out and played cards about 8 or 9 p.m. at the home of Mr. and Mrs. Edward Springer; that he did not go to any gas station nor did he see either *Fillippi* or *O'Donnell* that day.

F. *Ronald Stock* testified that on March 19, 1968 around 7 p.m.,

he saw and talked to Robert Stock (and others) at his mother-in-law's house and left said address about twenty to eight that evening; that he did not see Fillippi on March 19 at approximately 7 p.m. or at any time that day.

3. The testimony as to the service station conversation was a vital and important link in the state's evidence. As to this conversation the trial jury had before it the aforesaid conflicting testimony and the claim by Johnson concerning the lack of credibility of the testimony of Fillippi. The trial jury had to decide between Johnson, Maureen Stock, Ronald Stock and Robert Stock on the one side and Fillippi and O'Donnell on the other. The trial jury found Stock guilty. Therefore, it must be assumed the jury decided this conflicting testimony against Stock.

\* \* \*

5. The petitioner failed to establish, by *any creditable* evidence that respondents representatives engaged in improper or unprofessional conduct in connection with the testimony of one James O'Donnell.

6. Petitioner claims that Respondent knowingly suppressed evidence favorable to Stock. This claim has to do with an allegation that Fillippi, prior to trial, had advised State's Attorney's investigators that Petitioner's brother, Ronald Stock was likewise present at and participated in the purported gas station conversation. To establish this allegation, respondent called during the 'P. C.' hearing, State's Attorney's investigators, Robert Hughes and Joseph Gorman; Christine Borders Stock, a girl friend of Ronald Stock in 1968 and since April 4, 1970, his wife and Michael Borders, brother of Christine. Fillippi also testified to and denied any such alleged statement.

In the 1969 trial, Petitioner Stock called as witnesses on his behalf, Ronald Stock and his then wife, Maureen Stock. It is to be noted that Maureen testified on May 28, 1969 that (Chicago Police) Officer Motzny told her he suspected Ronald and Robert of committing the murder and questioned her about his whereabouts on March 21, 1968. Ronald Stock testified that he did not see Fillippi on March 19, 1968 and that on March 21, 1968, he was riding around with Christine Borders.

The evidence at the trial established by clear and convincing evidence that Petitioner Robert Stock, Ronald Stock his brother, Diane and Maureen Stock in 1968, had a very close relationship, hovered over by the Petitioner's mother, Henrietta and the mother of Maureen, Mrs. Ruth Flood.

Christine Borders testified she told Ronald Stock in 1968 about her conversations with Hughes, Gorman and Assistant State's Attorney Tully.

The evidence at the 'P. C.' hearing of Gorman, Hughes and Fillippi is strong and persuasive. Stock's claim on this point is not established. In fact, assuming arguendo Hughes and Gorman did tell Christine Borders Stock that Fillippi said Ronald was present at the gas station conversation, this Court, based on the observation of all the witnesses over long periods of time, finds it incredulous to believe that Robert Stock did not know such information at the time of the trial.

The petitioner failed to establish by any creditable evidence that Respondent knowingly suppressed any evidence favorable to Stock.[2]

6. Based on the entire record, considering the credibility (or lack thereof) of each witness, this Court finds the record is clear and convincing that Petitioner failed to establish any violation of a state or federal constitutional right of Robert Stock in the June 4, 1969 conviction."

For the foregoing reasons the judgment denying post-conviction relief (Appeal No. 57926) is also affirmed.

Judgments in case nos. 54593 and 57926 affirmed.

LORENZ and SULLIVAN, JJ., concur.

---

[2] Defendant has argued that *United States ex rel. Raymond v. Illinois* (7th Cir.), requires the reversal of the court below on the suppression of evidence issue. In *Raymond* the State failed to reveal to defense counsel the results of certain laboratory tests. Although defendant himself had been informed of these results, the failure to disclose this technical data to his attorney was held to be violative of due process of law. In the case at bar, however, the issue was not whether non-disclosure of the "fact" of Ronald Stock's presence at the gas station was suppression of material evidence but whether it was a "fact" at all. The explicit finding at the post-conviction hearing that the State's evidence on this point was "strong and persuasive" obviates the need for us to apply the *Raymond* test.