THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* MICHAEL ROSENBORGH *et al.*, Defendants-Appellants.

THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* JOHN J. SMITH, Defendant-Appellant.

(Nos. 55658, 59586 cons.; 

First District (5th Division)—July 12, 1974.

James J. Doherty, Public Defender, of Chicago (John T. Moran, Jr., Assistant Public Defender, of counsel), for appellants.

Bernard Carey, State's Attorney, of Chicago (Kenneth L. Gillis, Patrick T. Driscoll, Jr., Frederick I. Chaimson, and Marianne Jackson, Assistant State's Attorneys, and Terrence McQuigg, Senior Law Student, of counsel), for the People.

Mr. JUSTICE LORENZ delivered the opinion of the court:

## I.

A jury found Michael Rosenborgh guilty of armed robbery, aggravated kidnapping, and attempt (rape) in violation of sections 18—2, 10—2(a) (3) and 8—4 of the Criminal Code (Ill. Rev. Stat. 1967, ch. 38, pars. 18—2, 10—2(a)(3) and 8—4); John Smith guilty of armed robbery, aggravated kidnapping, and rape in violation of sections 18—2, 10—2(a) (3), and 11—1(a) of the Criminal Code (Ill. Rev. Stat. 1967, ch. 38, pars. 18—2, 10—2(a)(3) and 11—1(a)); and Jerome Smith guilty of armed robbery and aggravated kidnapping in violation of sections 18—2 and 10—2(a)(3) of the Criminal Code (Ill. Rev. Stat. 1967, ch. 38, pars. 18—2 and 10—2(a)(3).) Two co-defendants, Terry Davis and Matthew Jordan, were acquitted. Jerome Smith and Rosenborgh were sentenced to concurrent terms of two to eight years and John Smith to concurrent terms of twenty to forty years.

From these convictions all three appeal contending that: (1) they were not proved guilty beyond a reasonable doubt, (2) the State's use of various identification procedures violated due process of law, (3) the

trial court erred in not allowing them to call either the complainants or other arresting officers at the hearing on the motions to suppress, and (4) they did not receive a fair trial.

At a hearing on pretrial motions to suppress evidence and identifications, the following pertinent evidence was adduced.

*Police Officer Robert Frodin*

On the evening of August 11, 1969, he briefly spoke to the complainants at St. Francis Hospital and was given a description and license number of a car. John Smith was arrested by Midlothian Police as a result of this information. Later at about 1:30 A.M. at the Blue Island Police Station, Smith stated that he had loaned his car to the other defendants earlier in the evening. While John was sitting in a chair being questioned, Diane Wilmot and Mona Sullivan both entered the station and saw him. Later Mona saw John again and stated that he had attacked her. At about 2:00 A.M. John accompanied several police officers when they arrested the other defendants. On their arrival at the station Frodin conducted a line-up of six people, including all five defendants, which was viewed by the four complainants. He instructed the complainants to mark on their line-up tally sheets only the numbers of those they could positively identify. Mona Sullivan and Arthur Steelman identified John Smith, Jerome Smith, Davis and Rosenborgh. Mona placed a question mark after Rosenborgh's number. Diane Wilmot identified Jerome Smith and Jordan. Donald Carlisle identified Jerome Smith and Rosenborgh. Frodin also testified that the defendants participated in another line-up (relating to other crimes) but the complainants were not present.

*Defendant John Smith*

He was arrested by Midlothian Police as he got out of a car at an all-night gas station. He knew nothing about the car and had received it only a few minutes before. He was taken to the Blue Island Police Station where he alone was shown to some of his accusers, but they were unable to identify him. He did not see Mona Sullivan at the police station or at any time on the night of the occurrence. He was with the police when they went to arrest the other defendants, but he denied telling the police anything. He and the other defendants participated in seven line-ups, all of which were observed by the complainants. During the course of the evening, he was threatened and beaten. He testified he has a weak memory and only a kindergarten education.

During his testimony, a dispute arose when Mona Sullivan and Diane Wilmot entered the courtroom after a motion to exclude witnesses had been granted. The court was certain that they had exited immediately upon realizing their error. At the conclusion of his testimony, John Smith's counsel made requests to call the complainants and the other

arresting officers. The court, after observing that John's entire testimony was not credible, denied these requests and a motion to suppress.

*Annabelle Rosenborgh*

She is Michael Rosenborgh's mother. Sometime after midnight on the morning of August 12, 1969, three police cars arrived at her home. Two police officers, one white and one black, came to the door and arrested her son. She accompanied them. After arresting the three other defendants, they all went to the Blue Island Police Station. She observed only one line-up. She heard one of the officers say to the complainants: "I thought you said it was four boys and we have six boys here."

*Defendant Michael Rosenborgh*

Three police officers, none of whom were black, arrested him. John Smith was with the officers. He participated in four or five line-ups and his mother was present for at least three of them. Different people viewed the line-ups.

*Defendant Matthew Jordan*

He was arrested at his home in the early morning hours of August 12, 1969, by six police officers, including Officer Frodin. John Smith was with the officer. He participated in four or five line-ups. One of the police officers told the witnesses that they had to identify someone. He saw Mrs. Rosenborgh during the first line-up.

*Defendant Terry Davis*

He was arrested at his home by five police officers. John Smith was with them. He participated in four or five line-ups and different people were in the last few line-ups. He did not see Mrs. Rosenborgh at the station that night.

*Defendant Jerome Smith*

He was arrested at home. Everyone in his family, except his brother John, was there. At the station, he participated in six line-ups. Different people observed each line-up. He saw Mrs. Rosenborgh at the first line-up.

The trial court then denied Rosenborgh's, Jerome Smith's, Davis's and Jordan's request to call the complainants as witnesses, their motions to suppress, and their motions to be severed from the trial of John Smith and ordered the trial to proceed.

During *voir dire* examination of the jury, a female juror was asked whether she had ever been the victim of any crimes. She said she had been the victim of a robbery over twenty years ago. No challenge was made and she was sworn in as a member of the jury. After the trial had begun, she requested to speak to the judge. She told him that she had been raped in connection with the robbery but had been too embarrassed to tell the court. She assured the court that she had not told any

of the jurors about the incident. She was not asked exactly what she had said or to whom she had said it. The court excused her from further service with the jury, denied defendants' motions for mistrial, and proceeded with the trial using an alternate juror.

At trial the following witnesses testified for the State:

*Mona Sullivan*

Sometime after 10:00 P.M. on August 11, 1969, she was sitting with Donald Carlisle in the front seat of Carlisle's car in Calumet Park Grove and Diane Wilmot and Arthur Steelman were in the back seat. A car of Negro youths parked nearby. Two of them came over and asked for cigarettes. They produced weapons, ordered Carlisle to get in the right rear seat, and commandeered the car. Michael Rosenborgh drove and Jerome Smith sat beside the right rear door next to Carlisle. The car with the other Negroes followed.

After driving for about ten or twenty minutes, the cars stopped beside the road. Rosenborgh got out, opened the left rear door where Diane was sitting, and ordered her to come with him. However John Smith approached, closed the rear door, and directed her to stay with the others. John Smith then drove Carlisle's car while Rosenborgh followed in the other car. Jerome Smith warned John not to go near the house and John replied: "Don't worry, I know where I'm going, Jerome." After driving another ten or twenty minutes, they stopped in an unlighted garage.

John and Jerome Smith got out of the car and locked Carlisle and Steelman in the trunk. Rosenborgh then got in the back seat with Diane and John Smith got in the front seat with the witness. Rosenborgh unzipped Diane's pants. He hit her after she zipped them back up. John ordered the witness to remove her clothes and upon her refusal, with the help of Rosenborgh who ripped her bra, John removed them. She ripped John's white striped tee shirt near the neck. John then raped her. After penetration she passed out. The assailants left when they heard a motorcycle backfire. They took her purse and address book. She ran after John Smith to get the keys for the trunk, but John said he did not have them. She got a good look at him and noted the license number of his auto. At trial she identified a photograph of the auto. Carlisle and Steelman forced their way out of the trunk through the back seat and they all went to a nearby house and called the police.

She was taken to St. Francis Hospital and was examined by a doctor. Although she did not see the doctor's report, she thought it had been given to the police. During her testimony, John Smith requested he be shown all medical reports. These had previously been the subject of a pretrial discovery motion. The prosecutor denied any such reports were

in his file and Officer Frodin, the investigating officer who was sitting at the prosecutor's table, also denied he had any reports.

She and her mother went from the hospital to the police station where she saw the other complainants. She was shown John Smith in the back of the police station and identified him as the person who had raped her. John was wearing the shirt she had torn. She then observed a line-up. She identified John Smith, Jerome Smith, Rosenborgh and Davis by placing numbers on her tally sheet. She placed a question mark after Rosenborgh's number which she explained as something she had forgotten to erase. She was positive in her identification of John Smith and Rosenborgh. She identified a photograph of John wearing the torn shirt and she denied that pictures of defendants shown to her by the assistant State's Attorney before trial influenced her testimony.

*Diane Wilmot*

In addition to substantially corroborating Mona's testimony, she identified Rosenborgh as the first driver of Carlisle's car and John Smith as the second driver. She recalled that the second driver referred to the person in the back seat as "Jerome." She testified that after expressing his intent to have sexual intercourse with her, Rosenborgh unzipped her pants. When she zipped them back up again, he struck her repeatedly. She confirmed Mona's version of what happened in the front seat stating that at one point during the occurrence she did not see anyone's head. When she arrived at the police station with Carlisle and Steelman, they were shown John Smith, who was sitting in a chair. She viewed one line-up. Although her line-up tally sheet did not include Rosenborgh's number, she was certain she had identified him. She explained a statement made to the grand jury that Jerome Smith was the driver of the car as being due to her confusion regarding the names of the defendants. She was positive in her identification of Rosenborgh. She saw pictures of the defendants in the State's Attorney's office before trial.

*Arthur Steelman*

In addition to substantially corroborating the testimony of Mona and Diane as to the kidnapping and some of the other events, he identified all the defendants except Davis, but he was somewhat unsure of the exact roles each played in the crimes.

*Police Officer Robert Frodin*

He essentially repeated his testimony given on the motions to suppress.

*Midlothian Police Officer Raymond Horvath*

He received a police radio communication describing an automobile. He observed the automobile at an all-night gas station and arrested its driver, John Smith. He recovered Mona's address book from the dashboard of the car.

*Donald Carlisle*

After substantially corroborating the testimony of the other complainants as to the kidnapping and some of the other events, he identified Davis as the assailant who sat next to him in the back seat. Although he could not identify the drivers of the car, he thought John Smith and Jordan were involved and while he heard the assailants use the name "Jerome," he was uncertain to whom it applied.

For the defense:

*Joyce Ford, an alibi witness*

She is Michael Rosenborgh's aunt and he was babysitting for her three children until approximately 10:00 P.M. on the night of the occurrence.

*Annabelle Rosenborgh, an alibi witness*

She is Michael Rosenborgh's mother and corroborated Joyce Ford's testimony, stating that Michael arrived home soon after 10:00 P.M. and did not leave again that evening.

*Juanita Smith, an alibi witness*

She is the mother of John and Jerome Smith. She was called only on behalf of Jerome. All her children were home on the night of the occurrence. On cross-examination, over defense objections, she admitted that John had left for the evening at about 9:30 P.M.

*Richard Rekash*

He photographed the area and paced off the distances from two light poles at the opposite ends of the block to the garage in order to establish the lighting conditions in the area of the garage where the rape occurred. He did this at the request of John Smith's counsel.

OPINION

We shall first consider defendants' contentions on direct appeal and then consider John Smith's post-conviction proceedings.

■■ John Smith contends that he was not identified beyond a reasonable doubt. We disagree. He was identified in court by our eyewitnesses and linked to the crimes in numerous other ways. Mona Sullivan positively identified John Smith in court as the second driver of Carlisle's car and as the person who raped her. She had the best opportunity to observe; she was sitting in the front seat while he was driving; he drove for quite a while; she was the victim of his act; she got a good look at him outside the garage after he had raped her; and the whole series of events were of extended duration. Moreover, she identified him on the night of the occurrence after her arrival at the police station and again when he appeared in the line-up. She was firm in her identification of him at trial. The law is well established that a positive identification by one eyewitness alone is sufficient to justify conviction. (*People v. Stringer,*

52 Ill.2d 564, 289 N.E.2d 631.) In addition Mona's testimony was corroborated by the testimony of the other complainants. Diane Wilmot, Arthur Steelman, and Donald Carlisle also identified him. Other evidence also linked John Smith to the crimes. He was arrested within hours of the crimes in possession of a car bearing the description and license number of the assailants' car. Mona's address book was found in the car; and John was wearing the white striped tee shirt Mona had torn. A photograph of him wearing the torn shirt and a photograph of Smith's car also corroborated Mona's testimony. In these circumstances, we hold that John Smith was proved guilty beyond a reasonable doubt.

■■ Michael Rosenborgh and Jerome Smith urged that their convictions be overturned also, contending that they were not identified beyond a reasonable doubt. They argue that although eyewitnesses identified them in court, their identifications were vague, unreliable, and insufficient to overcome their alibi defenses. Rosenborgh points out that Diane told the Grand Jury that Jerome Smith was the first driver of the car; that Diane's line-up tally sheet did not include his number; and that Mona's tally sheet had a question mark after his number. Jerome Smith points out that Mona's testimony conflicted with Carlisle's regarding whether he was the assailant in the back seat. Both urge that Steelman's testimony be disregarded because it was uncertain. However, these matters were considered at trial by the jury and presented questions regarding the credibility of witnesses. The jury resolved these questions in favor of the State and against the defendants. (See *People v. Thompkins*, 19 Ill.App. 3d 674, 312 N.E.2d 380.) After reviewing the record it is our opinion that the jury's findings are supported by the evidence. Rosenborgh was identified by three eyewitnesses. Both Diane and Mona were positive in their identifications of him and explained the matters offered to impeach them. Jerome Smith was identified by two eyewitnesses in court. All four of the complainants identified him at the line-up on the night of the occurrence. Furthermore, three of the four complainants testified that one of the assailants referred to another as "Jerome" and two recalled that the second driver was referring to the assailant in the back seat of the car.

All of the defendants contend that the State's use of various identification procedures was unduly suggestive and argue that: (1) the use of the photographs before trial by the State was improper; and (2) the use of a line-up consisting almost entirely of persons suspected of being involved in the same crimes was improper. In addition, John Smith argues that he was improperly subjected to multiple show-ups.

■■ While police identification procedures suggesting to a witness that someone is the perpetrator of a crime are improper (*Stovall v. Denno*,

388 U.S. 293; *People v. Blumenshine*, 42 Ill.2d 508, 250 N.E.2d 152), it is recognized that all identification procedures contain some degree of suggestiveness and only those procedures which present a very substantial likelihood of irreparable misidentification are prohibited. (*Simmons v. United States*, 390 U.S. 377; *Neil v. Biggers*, 409 U.S. 188.) It is clear from the precedents that otherwise improper identification procedures may be justified by exigent circumstances. (*People v. Higgins*, 50 Ill.2d 221, 278 N.E.2d 68; *People v. Newell*, 48 Ill.2d 382, 268 N.E.2d 17; *People v. Young*, 46 Ill.2d 82, 263 N.E.2d 72.) It is also clear that such procedures cause no injury where a witness has a prior independent basis for his in-court identification. *People v. Martin*, 47 Ill.2d 331, 265 N.E.2d 685; *People v. Stock*, 15 Ill.App.3d 722, 304 N.E.2d 646; *People v. Winfrey*, 11 Ill.App.3d 164, 298 N.E.2d 413.

■■ First, the three defendants argue that the assistant State's Attorney's use of photographs before trial was improperly suggestive. However, the evidence shows that he used these photographs only to assist him in the preparation of his case by determining for himself what the testimony would be. The photographs were not used by the police to secure arrests or to suggest that defendants were the perpetrators of the crimes. Moreover, Mona Sullivan testified that the assistant State's Attorney did not influence her testimony. In these circumstances, the use of photographs was proper.

Next, the three defendants argue that the use of a line-up consisting almost entirely of persons suspected of being involved in the same crimes was improper. Although the composition of the line-up is a factor to be considered, defendants do not cite any case which goes so far as to hold that a line-up consisting almost entirely of persons suspected of being involved in the same crimes *in itself* makes an identification suggestive. There is no indication in the record that any of the defendants were identified simply because they were in the same line-up. We hold, in these circumstances, that the composition of the line-ups did not taint the identifications.

■■ In addition, John Smith argues that he was improperly subjected to multiple show-ups. We perceive his major complaint to be that he was displayed to three of the complainants and then to Mona before the line-up. He also complains that Mona and Diane both saw him during the pretrial hearing after a motion to exclude witnesses had been granted. We cannot say that these circumstances were suggestive. The fact that Diane and Carlisle viewed John did not affect their testimony; they did not identify him at the line-up within a few hours after the "show-up." Although one of the complainants, Steelman, did identify him at the line-up, it is clear beyond a reasonable doubt that his testimony did not

affect the jury's determination. Moreover, Mona's identification was positive. She had the best opportunity to observe Smith. He was on top of her and she had a good look at him. Her identification never wavered. She identified him within hours of the crimes; and her testimony was corroborated by other evidence. There was an independent basis for her identification. Moreover, the "show-up" at the pretrial hearing was obviously inadvertent and cannot be said to have resulted in prejudice. Upon reviewing the whole record, we cannot say that the identification procedures employed here were so suggestive as to deny the defendants due process of law.

■■ The defendants next contend that the trial court erred in refusing to allow them to call the complainants or to call arresting officers other than Officer Frodin at the hearing on the motions to suppress evidence and identifications. Hearings on such motions eliminate collateral issues at trial (*People v. Braden*, 34 Ill.2d 516, 520, 216 N.E.2d 808, 810) and permit defendants to preserve their constitutional rights. For these reasons, a defendant must be given ample opportunity to support his position and generally should be permitted to call and to examine those witnesses who have information bearing on the matters before the court. (*People v. Robinson*, 46 Ill.2d 229, 263 N.E.2d 57; *People v. Bentley*, 11 Ill.App.3d 686, 297 N.E.2d 282.) However, where it appears that a pretrial motion is frivolous or imposed for delay, a trial judge may terminate the hearing on such motions. *People v. Gatheright*, 9 Ill.App.3d 1058, 293 N.E.2d 734; *People v. Terrell*, 6 Ill.App.3d 941, 287 N.E.2d 74.

The failure of the trial judge to permit the defendants to call the complainants or any arresting officers other than Officer Frodin at the pretrial hearing was at most harmless error because all the complainants and an arresting officer other than Frodin testified at trial and there was ample opportunity to examine the facts and circumstances relating to the identifications. The identifications here were not the product of suggestive police procedures. Moreover, the evidence that defendants committed the crimes was overwhelming. In these circumstances we can say beyond a reasonable doubt that the trial judge's error was harmless.

The defendants finally contend that they did not receive a fair trial. They claim that: (1) the trial judge conducted the trial prejudically; and (2) the trial judge erred in not more thoroughly examining a juror excused after the trial had begun and that the juror's failure to disclose the fact that she had been raped impaired their right of challenge. In addition, Jerome Smith and Michael Rosenborgh claim that the trial judge erred in not granting a severance, and John Smith claims that the trial judge erred in permitting Jerome Smith's alibi witness to be cross-examined regarding him.

■■ In his conduct of a trial, a judge must be impartial. (*People v. Marino*, 414 Ill. 445, 111 N.E.2d 534; *People v. Rothe*, 358 Ill. 52, 192 N.E. 777.) While he must be careful not to influence the jury (*People v. Santucci*, 24 Ill.2d 93, 180 N.E.2d 491), he may forbid repetitious questions (*People v. Davis*, 35 Ill.2d 55, 219 N.E.2d 468) and he may question witnesses (*People v. Palmer*, 27 Ill.2d 311, 189 N.E.2d 265). Furthermore, although a judge must permit defense counsel to cross-examine witnesses (*People v. Coli*, 2 Ill.2d 186, 117 N.E.2d 777) and to make objections (*People v. Lewerenz*, 24 Ill.2d 295, 181 N.E.2d 99) he must also expedite the proceedings (*People v. McCain*, 29 Ill.2d 132, 193 N.E.2d 784).

In the instant case, defendants complain of the following actions by the judge during the trial: (1) the judge's statement that Steelman was unsure of the distance from a street light to the garage where the rape occurred; (2) his questioning of Rekash regarding the estimated length of the courtroom and his subsequent comment when Rekash under-estimated its length; (3) his comment that John Smith's counsel's method of attempting to impeach Officer Frodin was "just plain nonsense"; (4) his statements that he disliked John Smith's counsel's frivolous objections; and (5) his comments that John Smith's counsel should "sit down" and make "no speeches."

Trials of multiple defendants present great difficulties for a trial judge. The judge did not abuse his discretion in examining Rekash and his examination and comment were not prejudicial nor were they intended to be. The judge's characterization of defense counsel's "inartful" method of impeachment, although harsh, was not improper in the circumstances. The judge's comments that counsel should "sit down" should make "no speeches," and should make no frivolous objections were made in the context of expediting already lengthy proceedings. Moreover, the court praised counsel as being a good lawyer. We find no error in the judge's statement that Steelman was unsure of the distance to a street light since it was made only after several similar questions had been answered in the same manner. The court's conduct of the trial was not unfair.

■■ The defendants next claim that the trial judge erred in not more thoroughly examining a juror excused after the trial had begun and that the juror's lack of candor impaired their right to challenge. They rely primarily upon *People v. Cain*, 36 Ill.2d 589, 224 N.E.2d 786, and *Lewis v. United States*, 146 U.S. 370. We believe the case of *People v. Rohwedder*, 106 Ill.App.2d 1, 245 N.E.2d 282, presents a much more comparable situation. In *Rohwedder*, the trial court was confronted with the same unique situation the trial court was confronted with in the instant case—a juror's admission that she had not been fully candid on *voir dire* ex-

amination. The court in *Rohwedder* determined that defendant was not prejudiced by this situation. The same is true in the instant case. Although the trial judge in the instant case did not examine the juror regarding *exactly* what, if anything, she had said to the other jurors, the juror stated that she had not talked to the other jurors about the fact that she had been raped as well as robbed some twenty years before. (The fact that she had been robbed had been disclosed.) She carefully distinguished between the rape and the robbery and stated that she was too embarrassed to talk about the rape. In these circumstances, no prejudice resulted from the court's questioning or from the juror's lack of candor and her excuse from further jury service.

Jerome Smith and Michael Rosenborgh finally claim that the trial judge erred in not severing their trials from John Smith's. The law is clear that a severance is required where incriminating statements of a co-defendant are likely to be admitted into evidence at trial. (*Bruton v. United States*, 391 U.S. 123; *People v. Clark*, 17 Ill.2d 486, 162 N.E.2d 413.) Defendants would have us expand this rule to include situations where the jury may infer that a statement may have been made even though no such statement was used at trial. However, the effect of such an expansion would be a proliferation of trials and a repetition of testimony without greatly benefiting the accused. In the instant case, since John Smith's statement was not used at trial, we cannot say that the trial court erred in not granting a severance.

In contending that he was denied a fair trial, John Smith urges that the trial court erred in permitting Jerome Smith's alibi witness to be cross-examined regarding him. This was a unique situation. The mother of two defendants was called to present an alibi for only one of her sons, Jerome Smith. However, she testified that *all* her children were home on the night in question. Rather than leave the jury with the impression that John Smith was also home, the prosecutor properly examined her regarding the matter. Defendants were not denied a fair trial.

We find no merit in the defendants' contentions on appeal of their convictions. The convictions of Jerome Smith, Michael Rosenborgh, and John Smith are affirmed.

## II.

We now consider John Smith's appeal from dismissal of his post-conviction petition. He contends that: (1) he was denied due process of law by the State's failure to comply with a pretrial discovery motion regarding a doctor's report favorable to him and by the State's use of perjured testimony, (2) he was denied his right to a fair trial by the State's failure to correct a false impression left by certain testimony,

and (3) he was denied effective assistance of counsel by his counsel's failure to discover the doctor's report.

The following facts are pertinent to John Smith's post-conviction proceedings.

After his convictions, John Smith petitioned the court for relief pursuant to the Post-Conviction Hearing Act (Ill. Rev. Stat. 1967, ch. 38, par. 122—1 *et seq.*). His petition, in raising certain constitutional issues substantially the same as his contentions on appeal of dismissal of his petition, specifically alleged: (1) that Mona Sullivan testified that he had raped her, that she had passed out after penetration, that she was taken to the hospital and examined, and that she believed the doctor's report was given to the police; (2) that Officer Frodin was present at the hospital, that he had been present during some of the prosecutor's interviews with Sullivan, and that he and the prosecutor had stated that they did not have the report; and (3) that the report and other documents indicated Sullivan and Frodin had perjured themselves and that the State, knowing of this perjury, had not corrected the record.

Along with his petition, he filed, in addition to affidavits of counsel: (1) a copy of an emergency room report which indicated that Mona Sullivan stated she had been raped, that Officer Frodin was present at the hospital at the time of her examination, and that the examining doctor was the Sullivans' family doctor; (2) a copy of a "Leaving Hospital Against Advice" form signed by Mona's mother releasing the hospital from liability for Mona's discharge from the hospital; (3) a statement of the examining doctor explaining his report and indicating that Mona Sullivan had told him she had been raped; and (4) a copy of the examining doctor's report. The doctor's report states that "[Mona Sullivan] claims she passed out and does not know what happened to her physically" and that:

> "From this particular examination the diagnosis of rape absolutely cannot be made. The diagnosis will be based on evidence of traumatic entrance and there is no sign in the vaginal examination of a traumatic entrance. Other criterion would be a sign of ejaculation. There is no area of wetness of the pubic hairs, of the introitus, of the labia majora and labia minora fold. There is no sign of smear [sperm] actually within the vaginal tract, so the only thing that definitely can be made [said] is that there are no signs of trauma, there are no signs of sperm."

It also indicated that she was 14 weeks pregnant at the time of the incident.

Upon examining the petition, the trial court was initially impressed. He determined that an evidentiary hearing was required. When the date

for the hearing arrived, the State renewed its previously made motion to dismiss, alleging that Smith had failed to raise any constitutional questions and that his allegations were insufficient to require a hearing. After hearing arguments, the trial court dismissed the petition for failure to raise a constitutional question.

The Post-Conviction Hearing Act (Ill. Rev. Stat. 1967, ch. 38, par. 122—1 *et seq.*) provides that the State may move to dismiss a post-conviction petition where no constitutional issue is presented. Petitioner's contentions on appeal of dismissal of his post-conviction petition all relate to a doctor's report which stated that there was no medical evidence that Mona Sullivan was raped. The existence of this report was known at trial.

■■ The petitioner contends that he was denied due process of law by the State's failure to comply with a pretrial discovery motion regarding a doctor's report favorable to him and by the State's knowing use of perjured testimony. At the time Smith made his pretrial motion, the criminal discovery rules were not in effect. His pretrial motion was based upon *Brady v. Maryland*, 373 U.S. 83. In *Brady* the court stated:

"We now hold that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." (373 U.S. at 87.)

In the instant case, the facts do not indicate that the State suppressed anything. The prosecutor stated that he did not have the report in his file; Officer Frodin stated that he did not have the report; the complainant had no direct knowledge regarding the report; and the doctor's statement did not indicate that he had given the report to any police officer. Even if we were to assume that the report was material, since the State did not have the report, it can hardly be accused of suppressing it. (*See People v. Richards*, 120 Ill.App.2d 313, 350, 256 N.E.2d 475, 494.) Furthermore, the facts do not indicate that the State knowingly used perjured testimony. First, defendant assumes that because there was no medical evidence of rape that the rape did not occur (an assumption even the doctor in his statement was unwilling to make) and concludes that therefore Mona Sullivan must have perjured herself by testifying that she was raped. Although the doctor's report suggests that Sullivan *may* have made a prior inconsistent statement regarding when she passed out, the emergency room report, which was made at the same time as the doctor's report, and the doctor's subsequent statement both indicate that Sullivan said she had been raped. This is consistent with her testimony at trial. Thus, it cannot be said that Mona Sullivan perjured her-

self. Second, defendant assumes that because Officer Frodin was present at the hospital, he received a copy of the doctor's report. During Sullivan's testimony when the existence of the report first became known, Officer Frodin was asked whether he had the report and, although he was not under oath, he answered that he did not have the report. Subsequently, he was called as a State's witness and subjected to cross-examination. Nothing in cross-examination or in the doctor's statement indicates that Frodin was given the doctor's report. We find no evidence that he perjured himself. In these circumstances we cannot say that defendant was denied due process of law.

The petitioner also contends, relying upon *Napue v. Illinois*, 360 U.S. 264, and *People v. Higgs*, 11 Ill.App.3d 1032, 298 N.E.2d 283, that he was denied a fair trial by the State's failure to correct false and misleading impressions left by the testimony of Mona Sullivan and Officer Frodin. In the instant case, as we have already held, there is no evidence that either Sullivan or Frodin perjured themselves. For the same reasons, there is no evidence that there were any false or misleading impressions left by their testimony. Petitioner's contention lacks merit.

The petitioner finally contends that he was denied effective assistance of counsel by his counsel's failure to discover the doctor's report. We do not agree. Not only does the record disclose that defense counsel ably represented defendant at trial as the trial court specifically commented, but it appears, for example from the trial testimony of Richard Rekash, that defense counsel did investigate the facts surrounding the crimes. Defense counsel knew at trial of the existence of the report; he may, therefore, have also known of its contents. However, whether he knew of its contents or not, he apparently decided not to explore that matter further at trial. This decision, made in the course of a lengthy trial of many defendants and with multiple charges against his client, was a matter of judgment, not of incompetence. *People v. Wesley*, 30 Ill.2d 131, 195 N.E.2d 708.

Therefore, the dismissal of John Smith's post-conviction petition is affirmed.

Judgments affirmed.

SULLIVAN, P. J., and DRUCKER, J., concur.