CHARLES NORMAN *et al.*, Plaintiffs-Appellees, v. AMERICAN NATIONAL FIRE INSURANCE COMPANY, Defendant-Appellant.

Fifth District   No. 5—87—0594

Opinion filed May 15, 1990.

272

Donald V. Ferrell, of Jelliffe, Ferrell & Morris, of Harrisburg, for appellant.

Kenneth R. Hughes and William L. Broom III, both of Barrett, Twomey, Morris, Broom & Hughes, of Carbondale, for appellees.

JUSTICE GOLDENHERSH delivered the opinion of the court:

Defendant, American National Fire Insurance Company, appeals from a jury verdict in the circuit court of Williamson County against defendant and for plaintiffs, Charles Norman and Susan Norman, for damages due to a residential fire on February 10, 1984, for which there was alleged coverage under a homeowners' policy. Additionally, the trial court imposed penalties under section 155 of the Insurance Code (the Code) (Ill. Rev. Stat. 1985, ch. 73, par. 767). Judgment was entered on the verdict in the amount of $213,028.90. Plaintiffs were also awarded prejudgment interest at the rate of 5% per annum on $195,528.90 from May 6, 1984, until January 27, 1987, for a total of $26,948.74, and post-judgment interest at a rate of 9% per annum from the rendering of the verdict on February 6, 1987, until the date of entry of judgment. Pursuant to section 155 of the Code (Ill. Rev. Stat. 1985, ch. 73, par. 767), plaintiffs were awarded attorney fees in the amount of $62,755, and all costs and litigation expenses, which amounted to $17,483.60, and the statutory penalty in the amount of $25,000. In this cause, defendant raises the following issues: (1) whether the jury verdict was against the manifest weight of the evidence, (2) whether the trial court committed errors in rulings on the admission of evidence and on the law warranting a new trial, and (3) whether the judgment of the court in assessing penalties under section 155 of the Code (Ill. Rev. Stat. 1985, ch. 73, par. 767) was contrary to the manifest weight of the evidence. This court affirms.

Defendant insured plaintiffs' residence under a standard HO3 homeowners' policy which provided coverage for replacement costs on the policy. The policy provided for replacement costs of $145,000 on the structure, $72,500 on plaintiffs' personal property, and $29,000 for loss of use. Plaintiffs were husband and wife and owned the property as joint tenants. Plaintiff Charles Norman had recently talked to his insurance agent, Tom Couch, about changing insurance companies because plaintiff believed the premiums were too high. Plaintiffs had built most of the home themselves. The home was 90% complete at the time of the fire on February 10, 1984. On that same date, following the fire, plaintiffs' insurance agent notified defendant of plaintiffs' loss. Investigations by the local fire department, State Fire Marshal's office, and defendant ensued. Plaintiffs filed proof of loss on March 1, 1984, and defendant received it in its Chicago office on March 6, 1984. On March 27, 1984, plaintiffs sent a letter to Mr. Kis-

sane at defendant's Chicago office requesting payment. Defendant received this letter on April 10, 1984, but plaintiffs never received a reply. On June 2, 1984, plaintiffs sent another letter to defendant again requesting payment. Plaintiffs did not receive a reply to this letter. On June 24, 1984, defendant denied plaintiffs' claim. Plaintiffs filed a complaint against defendant for denial of their claim on July 12, 1984. On August 15, 1984, defendant filed a motion to dismiss based on the affirmative defense of arson and, further, on October 24, 1984, defendant moved to amend said motion to dismiss count III of plaintiffs' complaint in which plaintiffs asked for punitive damages. On December 12, 1984, an order denying defendant's motion to dismiss was filed and defendant was given 28 days in which to plead. On January 9, 1985, defendant answered plaintiffs' complaint. Defendant also moved for a change of venue from Judge Arlie O. Boswell, Jr., on September 4, 1984, which was granted on September 25, 1984.

On March 6, 1985, defendant moved to certify for interlocutory appeal the trial court's previous order of December 12, 1984, denying defendant's motion to dismiss count III, which was based upon the theory that defendant's refusal to pay under the insurance policy constituted bad faith and gave rise to an action for punitive damages. On April 25, 1985, plaintiffs filed a motion and memorandum in opposition to defendant's motion to certify this question for interlocutory appeal. This issue became moot when the trial court later dismissed count III of plaintiffs' complaint.

On April 24, 1985, plaintiffs served interrogatories upon defendant. On May 21, 1985, defendant moved for a 30-day extension of time to answer interrogatories served by plaintiffs. This motion was granted on May 22, 1985. However, on May 24, 1985, plaintiffs sent a letter to the trial judge objecting to the extension of time. On July 18, 1985, defendant filed answers to plaintiffs' interrogatories.

On August 8, 1985, plaintiffs made a request for production of documents and a special request to produce and return plaintiffs' refrigerator motor, which defendant retained for over one year and which plaintiffs, through their attorneys, had previously requested returned.

On September 23, 1985, plaintiffs filed three motions to compel. First, plaintiffs moved to compel answers to interrogatories which plaintiffs had filed on April 24, 1985. Plaintiffs stated that defendant, through its attorney, had failed to answer interrogatories and had objected to, refused to answer, or gave insufficient answers to interrogatories Nos. 6, 7, 8, 9, 10, 11, 12, 13, 14, 16 and 17. Second, plaintiffs moved to compel answers to interrogatories concerning expert wit-

nesses pursuant to Supreme Court Rule 220 (107 Ill. 2d R. 220), which plaintiffs had originally filed on May 23, 1985. Third, plaintiffs moved to compel compliance with their August 7, 1985, production request.

On November 14, 1985, defendant filed an affidavit of compliance with plaintiffs' special request for production and answers to interrogatories Nos. 6 through 14, inclusive. On December 4, 1985, plaintiffs again filed a motion to compel answers to interrogatories Nos. 9, 11, 12, 13 and 14. On December 18, 1985, defendants filed for an extension of time to answer plaintiffs' interrogatories numbered 10 through 14, inclusive. On February 25, 1986, defendant disclosed its experts. On March 13, 1986, defendant filed an amendment to answers to interrogatories numbered 11 through 14, inclusive.

Plaintiffs filed additional supplemental interrogatories on May 29, 1986, and on July 3, 1986. On July 29, 1986, plaintiffs filed a supplemental request for production of documents. On September 10, 1986, plaintiffs had not received any answers to these requests and plaintiffs moved to compel compliance with all three requests. Plaintiffs' motions to compel were granted on September 17, 1986, and defendant was ordered to answer on or before September 29, 1986. On September 30, 1986, defendant moved for an extension of time to comply with the September 17, 1986, court order and filed answers to plaintiffs' supplemental interrogatories of May 29, 1986.

On October 7, 1986, defendant moved for a continuance from the scheduled trial setting of October 14, 1986, due to defense attorney Ferrell's representation of another client in Federal court. Said motion was granted, and trial was rescheduled for October 16, 1986, unless Mr. Ferrell went to trial. In that case, the trial was scheduled for January 13, 1987.

On October 14, 1986, defendant filed a renewal motion attacking plaintiff's complaint.

On November 12, 1986, defendant filed answers to plaintiffs' supplemental interrogatories filed on September 28, 1986.

On November 14, 1986, defendant moved for a bifurcated trial. On December 1, 1986, plaintiffs filed a memorandum in opposition to defendant's motion for a bifurcated trial. On December 3, 1986, the trial court ruled that section 155 of the Code (Ill. Rev. Stat. 1985, ch. 73, par. 767) preempted count III of the complaint and, therefore, dismissed count III. The trial court found that this ruling made moot defendant's motion for a bifurcated trial. On November 26, 1986, defendant had filed supplemental interrogatories which plaintiffs answered on January 20, 1987.

On January 6, 1987, plaintiffs filed a motion for partial summary judgment. On January 8, 1987, defendant moved for a continuance from the jury trial setting because Joubert R. Webb, property claims manager for defendant, was unexpectedly hospitalized on January 4, 1987. The trial began on January 29, 1987, at 9:15 a.m. The following facts were adduced at trial.

Plaintiff Susan Norman was called as an adverse witness pursuant to section 2—1102 of the Code of Civil Procedure (Ill. Rev. Stat. 1983, ch. 110, par. 2—1102). She testified that she and her husband had about $30,000 in the house and had secured long-term financing with Chester Savings and Loan for $70,000. On the day of the fire, February 10, 1984, plaintiff left her house about 7:30 a.m. and did not return home until after the fire. She got off work shortly before noon and went to the home of a friend, Sarah Gieselman. Her husband, Charles Norman, came by Ms. Gieselman's house at approximately 12:30 p.m. and stayed until about 1 p.m. He took measurements for bookshelves he was to construct at the Gieselman residence. After Mr. Norman left, Mrs. Norman and her friend went to the shopping mall in Carbondale, where she learned of the fire. She stated that she and her husband were the only persons who had keys to their residence.

Plaintiff Charles Norman was also called as an adverse witness. He testified that on the morning of the fire he was at home working on bids in his construction work. At approximately 11:30 a.m., he left the house and went into the yard about 150 feet south of the house and attempted to get a tractor unstuck. His view of the house was unobstructed. He was unsuccessful in getting the tractor unstuck. He then borrowed an empty five-gallon gasoline can from a neighbor, walked back to his residence, and drove to the Gieselman residence. He was there for approximately one-half hour and left shortly before 1 p.m. From there he drove back to a gas station in Carterville, filled up the gas can, and drove back to the tractor at his residence. He then poured the five gallons of gas in the tractor and continued to try to get it unstuck for a period of 5 to 10 minutes. He still could not get the tractor unstuck, so he left his residence and ran errands around Carterville. He returned to his residence at approximately 1:30 p.m. Plaintiff estimated that he had been away from his residence for approximately 15 to 20 minutes, and upon returning, found the house was on fire and flames were coming out of the soffit on the second level in the area of the eaves at the kitchen and licking onto the roof. When he left, all the doors were locked. Because they had not yet built steps to the second level, he had to climb a stepladder to

get to the second level. He then attempted to enter the house on the west side but could not get in because it was locked. He made several other attempts to get in the house, but all attempts were unsuccessful due to both locked doors and smoke.

Following the fire, defendant was notified of the loss by Tom Couch, plaintiffs' agent. On February 10, 1984, during midafternoon, Curt Davis, a self-employed insurance adjuster for the Davco Adjustment Company with 23 years of experience, received a call from Joe Webb, the property claims manager for defendant, to respond to the fire on behalf of defendant. Davis then telephoned Tom Couch to make contact with plaintiffs and to inform them that he would meet them at the office of Mr. Couch at 8 a.m. the following morning. Thereafter, Davis went to the fire scene on February 11. He then met with plaintiffs and took their statement. He surveyed the damage, took numerous photographs, and made a perimeter survey of the damages. Because Davis felt the fire was suspicious, he took Mr. Herbert Milnes, a cause-and-origin specialist of Hoyle and Associates, to the Norman fire scene on the Tuesday following the Friday fire. Larry Addison of the Carterville fire department was also there examining the damaged structure. More photographs were taken, and Mr. Milnes used a device called a hydrocarbon detector or "sniffer" to attempt to detect flammable liquid residue, more commonly known as an accelerant. A positive reading was noted in the kitchen in the area of the floor where the refrigerator had been located. Mr. Milnes removed a sample and placed it into a clean plastic evidence bag. He did not, however, take a control sample from another area of the house.

Mr. Davis then notified Joe Webb, at defendant's Chicago office, of his preliminary findings. He noted that the entire roof was burned away as the result of an extremely fast-burning, furious type of intense fire resulting in a large gaping hole in the kitchen floor. He further noted a melted aluminum threshold and numerous fires that upon preliminary inspection did not appear to be communicated or connected to one another. Mr. Webb instructed Mr. Davis to retain Hoyle and Associates on behalf of defendant to proceed for the purposes of a cause-and-origin investigation to determine the basis of the fire.

On cross-examination, Davis admitted that Mr. Addison, the arson investigator for the Carterville fire department, called him at 8 p.m. on February 26, 1984, about a possible burn mark on the refrigerator. At this point, Davis had already completed his report. He did not change his report to reflect a possible burn mark on the refrigerator nor did he notify Hoyle and Associates, defendant's experts, of the call. Davis also admitted that at some point he did find kerosene un-

der the sink in the kitchen; however, Davis did not think this was important as the kitchen cabinets in the area where the kerosene was found were still intact.

David Schumann, employed by both the Schaumburg fire department and Hoyle and Associates, testified for defendant. He has been engaged by Hoyle and Associates to do fire-scene investigations approximately 600 to 700 times. As a fire fighter, he has investigated 300 to 500 fires.

Mr. Schumann testified that there are three things required to initiate a fire: oxygen, fuel, and heat. Once initiated, a fire produces heat and light. Heat produced by fire is lighter than air and thus rises to the ceiling and accumulates there unless the ceiling temperatures are hotter than those at the fire. In a normal structural fire one would expect ceiling temperatures of 1,200° to 1,400° Fahrenheit as compared to 150° to 200° Fahrenheit at the floor. Heat travels upward until it reaches some type of barrier, i.e., a ceiling, then it spreads out laterally and eventually goes out the doors.

A normal structural fire is one initiated by accidental means which feeds itself upon normal combustibles found in a structure. On the other hand, a nonaccidental fire is one that is purposely or intentionally set. Based on his experience, intentionally set fires are most commonly the result of the use of flammable liquids used as an accelerant such as diesel fuel, lighter fluid, or gasoline. Because flammable liquids produce a much higher degree of heat than does wood, there is much more fire damage at the floor in an intentional fire as compared to an accidental fire. An accelerant will produce temperatures between 600° and 2,500° Fahrenheit.

Mr. Schumann had been contacted by the office manager of Hoyle and Associates on February 15, 1984, to conduct an investigation as to the cause and origin of plaintiffs' fire. He was told to call Curt Davis to make arrangements to meet Mr. Davis in Marion. He met Mr. Davis on February 20, 1984. The two of them went to the fire scene, examined the exterior and interior of the burned-down house, made a diagram of the layout, took numerous photographs, discussed the matter with plaintiff Charles Norman, and the fireman, Larry Addison, shoveled fire debris from various areas, and took samples from the building for analytical testing. On February 21, 1984, he returned to the fire scene and met with Sam Davis, a furnace contractor, who had been called upon by Curt Davis to examine the heating and furnace system to determine if that was the cause and origin of the fire. Sam Davis expressed the opinion that the furnace unit had not been the cause of the fire at plaintiffs' residence.

David Schumann opined that flammable liquids had been poured on the floor in several areas, but the three samples that he took tested negative. Test results of the first sample provided by Mr. Milnes indicated the presence of fuel oil residue. Based upon his examination of the building, it was his opinion that the fire originated in six separate, noncommunicated areas of origin. The first area was located in the kitchen, the second area in the living room at the west entrance, the third area in the west center of the living room, the fourth area in the south living room, approximately eight feet east of the west wall, the fifth area along the south living room wall approximately five feet west of the east well, and the sixth area in the basement at the east end of the ceiling level in the vicinity of the trunk line for the furnace ductwork.

In the kitchen, the flooring was three-quarter-inch plywood and the floor joists indicated a fire right on the floor that had burned downward. The falldown, or the dropping of the floor of the roofing material as it burns, would not, in his opinion, create sufficient temperatures to burn through a three-quarter-inch plywood floor. The floor joists demonstrated large blisters and alligator-type char typically caused by a quickly burning fire as opposed to a smaller char which one finds in a slow, smoldering, or accidental-type fire. Additionally, he found a melted aluminum threshold in the living room which was totally melted from intense heat. According to this witness, aluminum requires 1,218° Fahrenheit to melt, and such temperatures of that magnitude are not found in the floor of a normal fire. The source of that degree of heat, in his opinion, was flammable liquid.

Mr. Schumann testified that it is not unusual for samples to test negative and such a finding is not indicative of lack of an accelerant in that the accelerant may be totally consumed by the fire, washed away by the use of water of the firemen, or may just evaporate over a period of time when exposed to open air.

Additionally, according to Mr. Schumann, flammable liquid had been poured into the heat duct as indicated by a white discoloration on the heat register. According to this witness, this discoloration only occurs with intense heat. There was heavy damage above the furnace because the furnace was running during the fire, and it sucked superheated air down which caused heavy damage. The witness noted that there was very little damage in the basement. According to Mr. Schumann, the falldown debris of a normal fire does not generate sufficient temperatures to cause a 2-by-4, a 2-by-12 or a 2-by-14 to burn through, which happened at plaintiffs' residence. According to Mr.

Schumann, beams in the ceiling give a clue that accelerant was used. For example, one beam was totally burned away while the one next to it, 16 inches away, was unburned. If this was an accidental fire, both would be damaged approximately the same amount.

Mr. Schumann also noted that the construction is a typical wood-frame type. Dry wall was used, which is fire retardant. There was a skylight in the kitchen which would be a weak link in the course of fire development in that, according to this witness, it would fail at about 900° Fahrenheit, allowing for early ventilation of the products of combustion to be evacuated from the building, similar to a fireman chopping a hole in the roof to limit the spread of the fire. It draws the fire to the hold like a chimney flue, and had the fire originated in the kitchen, and no other place, the skylight would have failed very early, within 15 minutes, and thus would have contained the fire within the kitchen and would not have permitted the fire to spread laterally to other rooms. It would have drawn all the heat, all the by-products of combustion, right to the skylight. However, because there were other origins of fire throughout the house, the fire spread.

While Mr. Schumann never made any investigation or determination that the cause of the fire was or could have been the refrigerator or the refrigerator motor, he explained that this could not have been the origin of the fire because the flooring supporting the refrigerator was the only portion which survived the fire. If it had been the initiating factor, the floor beneath the refrigerator would have collapsed first. In Mr. Schumann's expert opinion, based on his investigation and the information he was provided, Mr. Norman was on the property when the fire originated.

On cross-examination, Mr. Schumann testified that he had never been retained by an insured suing an insurance company for failure to pay on a policy of insurance. Mr. Schumann did not know the locations of the items of furniture in the living room, and did not know that furniture was in the area shown on defendant's exhibits 110, 95, and 96 in which he had described "certain holes." He did not conduct any tests on the polyurethane foam pad under the carpeting, and the sample he took of the carpet and pad did not show any signs of accelerant. He stated that the three holes in the living room floor were located at or near entranceways or heat registers. Mr. Schumann did not know what materials were used in the ceiling of the kitchen and the living room when he prepared his report. Mr. Schumann said the floor "was locked, plywood sheets that would lock in together," and agreed that made for a very tight floor. He also agreed with the statement from the book *Fire Investigation* by Paul L. Kirk, which

states as follows:

> "Configuration at low burn. In many instances the point of lowest burn is a floor surface or regions directly under the floor. These points are sometimes difficult to evaluate and often lead to an error in interpretation. For example, there is a hole burned in the floor in a region away from all walls, or other objects which would carry the fire upward by providing fume in the path of the flame. It is not uncommon for an investigator to assign the cause to the use of a flammable liquid. Such an interpretation is more often incorrect than otherwise. On a tight floor it is always incorrect, unless holes or deep cracks are present. Lacking such conditions, flammable liquid never carries fire downward." P. Kirk, *Fire Investigation* at 74.

Although Mr. Schumann did not look at the refrigerator or the refrigerator motor, he did consider the opinion of Larry Addison, a Carterville fireman who believed that the refrigerator motor was the cause of the fire. However, Mr. Schumann did not believe that Mr. Addison's interpretation was correct. Mr. Schumann also considered the opinion of Barney West, the Deputy State Fire Marshal, that the fire originated in the ceiling, but Mr. Schumann did not find it confirmed by the evidence.

Defendant engaged Richard W. Kragh, president of Kragh Engineering, Inc., an electrical engineering and consulting engineering firm in Naperville, for the purpose of examining and evaluating the refrigerator motor. Mr. Kragh picked up the refrigerator motor from defendant on March 9, 1984. He photographed it and visually examined it. His examination was nondestructive. Testifying as an expert, Mr. Kragh stated that the motor did not fail in any manner which was causative of the fire. The damage to the motor, which he observed, was the result of exposure to heat from an external source or an external fire. In his opinion, no arcing had occurred, as the even pattern of carbonization indicated the motor was just slowly cooked, or exposed to heat. Furthermore, it is a physical impossibility to obtain arcing in a motor such as this. An embedded arc cannot occur because there is insufficient voltage to sustain or initiate an embedded arc. If two exposed, uninsulated copper wires of the windings came together, the only result would be a short circuit. Had there been an arc to the frame, there would have been a fusing of the wires together and generally it would result in a hole in the frame. The windings indicated a relatively even pattern of oxidation indicative of no one particular hot spot. This motor had only one bearing, and if it seized, the temperature of the motor would rise only to a maximum of 302° Fahrenheit.

This is because this motor was impedance protected, and this temperature is standard based upon impedance-protected motors by the witness' calculations.

On cross-examination, Mr. Kragh testified that he was not able to turn the shaft and was not able to determine whether carbon in the interior was the cause of the sticking of the motor. He did not dig into the windings, nor did he examine the windings under a microscope.

Additionally, Barker Davie, a forensic chemist and fire investigator, and a partner in the firm of Barker & Herbert Analytical Laboratories, Inc., of New Haven, Indiana, testified as an expert witness for defendant. He has personally investigated approximately 1,500 fires and has assisted several police departments in both Canada and the United States to determine the cause and origins of fire.

His laboratory received four samples with reference to plaintiffs' fire. He testified that sample one, a sample from the kitchen, tested positive for kerosene residue and that other samples were negative. As to these negative samples, Mr. Davie testified that the tremendous amount of heat generated by a fire may totally destroy the fuel itself, that the water utilized in the firefighting may wash away the remaining residue and, lastly, that the sample may evaporate into the atmosphere.

Upon examination of samples and photographs of the scene, it was Barker Davie's opinion that this fire was incendiary in nature based upon the burn patterns that are abnormal coupled with the positive finding of an accelerant in the kitchen. In the kitchen, the only section of flooring that remains is that which supported the refrigerator, yet the perimeter around the refrigerator is burned almost completely away and the entire floor is virtually gone. That is abnormal and had the refrigerator been the source of the fire, the flooring underneath it would have been in the position to have burned first, according to Barker Davie.

In Mr. Davie's opinion, the length of time for this fire to develop, if incendiary in nature, to the point that flames were observed by Mr. Norman, would be 10 to 50 minutes. Additionally, the fire must have burned at least an hour or more to the point of burning through the roof, which additionally would produce a large amount of smoke and crackling noise. Although the ceiling consisted of a vaulted pine ceiling, when the ceiling burned and that material fell to the kitchen floor, it would not burn holes in the floor, according to the witness. Additionally, in his opinion, flammable liquid had been poured in the duct work based upon the discoloration plus the burn pattern around

the openings. The burn patterns portrayed by Mr. Schumann's photographs were not caused by the falldown, according to this witness. There is nonuniformity of burning over the area where the debris would have fallen and a morphous burn pattern in areas where no furnishings were indicated.

Assuming that the temperature of the refrigerator motor would rise to a maximum of 302° Fahrenheit if the bearing froze or seized, it would be virtually impossible for the motor to create sufficient heat to ignite surrounding combustible materials and thus communicate the fire to the wallpaper behind the refrigerator. Wood and paper have a flash point of roughly 450° to 550° Fahrenheit and thus the motor which would produce a maximum temperature of 302° Fahrenheit upon seizing does not produce sufficient heat to ignite the surrounding combustible material. Additionally, Mr. Davie stated that a piece of wallpaper affixed to a wall has a different flame spread pattern and characteristics as compared to one that is free and not affixed because of the reduced area for oxygen.

On cross-examination, Mr. Davie stated that of approximately 1,400 to 1,500 cases which he has taken, he has only represented homeowners against insurance companies in five of those cases. He stated that aluminum thresholds are not pure aluminum, but are alloys with a melting point of about 1,000°. He was aware that the ceilings in the living room and the kitchen were yellow pine, which can reach a temperature of 1,800° to 1,900° Fahrenheit.

Mr. Anthony S. Pulgine, claims manager for defendant, testified that he had reviewed the claim file regarding this matter. Mr. Pulgine was not the claims manager at the time of the fire; rather, Mr. Kissane was the claims manager during February 1984. Kissane is no longer employed by defendant.

Plaintiffs submitted their sworn statement of proof of loss on March 1, 1984, and it was received by defendant on March 6, 1984. On June 26, 1984, the insurer, by letter of Joe Webb to plaintiffs' attorney, declined the claim. The denial was based upon concealment or fraud, in that the insurer does not provide coverage for any insured who has intentionally concealed or misrepresented any material fact or circumstance or made false statement or engaged in fraudulent conduct relating to the insurance. Mr. Pulgine also explained that defendant is a subsidiary of Great American Insurance Company. On cross-examination, Mr. Pulgine testified that there were no reports in the file to show that plaintiffs had any financial motive to set fire to their residence.

Plaintiff Susan Norman was the first to testify during plaintiffs'

case. She testified about beginning the building of the home in August of 1982, and that both she and her husband worked on construction of the home. She identified the ceilings as being made of Southern pine in the kitchen, living room, and master bedroom. Further, she described the overall layout of the home. She testified that all their debts were current and paid.

Plaintiff listed what was lost in the fire. She most regretted losing the pictures of her children, a table made by her brother, a hutch that her husband had refinished, the bedroom suite that was her favorite because her husband had given it to her, all of their clothes, and items from her grandmother and her parents. She examined the proof of loss and stated that the statements it contained were true. Mrs. Norman testified that approximately one quart of kerosene was kept in the kitchen under the sink. Additionally, there was a kerosene lamp near the fireplace in the living room.

Next, plaintiff Charles Norman testified. He described the care he took in building his home. He identified defendant's exhibit 101 as the southeast side of the living room close to the fireplace. There were two holes, one directly under where a diffuser or vent was and one approximately 1½ feet west of that. That hole was made when the furnace man put the diffuser in the wrong place and it had to be moved back. That hole had been patched with a piece of plywood that the carpenter had cut out and was patched back in with a two-by-four to hold it in place.

During the fire, plaintiff tried to get into the workshop area to get his tools out. He finally left to look for his wife, and later became ill from smoke inhalation and was taken to the Carbondale Hospital, where he was admitted and remained overnight for observation. He testified about losing his photographs, birth certificates, titles, his stereo equipment and his record collection of which he was very proud. He testified that at the time of the fire they had a 1974 LTD and a pickup truck and owed no money on either vehicle. Plaintiff testified about his motorcycle which was completely destroyed. He testified he had no insurance at the time on the motorcycle. Both plaintiffs denied any involvement in causing the fire.

Barney West, a special agent with the arson bureau of the State Fire Marshal's office from 1974 until October 31, 1984, testified that he examined plaintiffs' residence following the fire on February 14, 1984. He concluded that the fire started in the attic above the utility room, bedroom, and bathroom. He concluded the fire ignited from the junction box above the utility room. He found no evidence of the use of an accelerant. He noted that burn patterns in the living room were

not unusual because the carpet pad contained polyurethane foam, which burns just like gasoline. Additionally, it was his opinion that the falldown from the roof caused the burning away of the floor in the kitchen. During his career with the State Fire Marshal's office, Mr. West investigated between 1,700 and 1,800 fires. He testified that in 1982, there were 69 convictions outside the City of Chicago for arson. Twenty-three of these 69 convictions were by Mr. West.

Charles Patrick was a volunteer fireman at the scene. He described how the fire fighters began to fight the fire. As they started into the living room he testified, "We fell through the floor."

Next, Joseph E. Barbay, a Ph.D. in electrical engineering at Southern Illinois University at Carbondale, testified for plaintiffs. He became involved in the investigation of the Norman fire through Professor Bell, another teacher at the university. He described impedance-protected motors and then explained that there is a great chance for dust and materials to gather under the refrigerator and catch the motor. If the motor was such that it would cause a high current flow, then with the dust accumulations one could anticipate a chance for fire. He also testified that if something tends to bind the motor, not stall it, the motor reacts over a fairly wide range of speed by pumping more power into the rotor.

Before examining the motor, Dr. Barbay read the manual which came with it. He then took the motor apart and photographed every step. He also used a microscope during his examination. Dr. Barbay rendered the opinion that there was a local fire in the refrigerator and he did not believe there was an impingement fire coming in low. According to Dr. Barbay, the beading on the tip of the wire suggested the possibility that there was current flowing at the time the wire broke. Additionally, he testified that blackening in the center of the motor suggested a heating from the center. He observed less damage toward the front of the refrigerator, so it did not appear to him to be a fire which encroached on the refrigerator from the front. He further stated that it was a possibility that the windings became hot as a result of a friction problem with the bearing and the bearing overheating with the flame coming out of the opening. He was not sure how the fire could have climbed out of the motor, but he stated there is a possibility that the motor casing became hot as a result of the friction on the inside of the unit. Further, he testified there was a possibility that the motor was covered with dust and the dust was ignited as a result of the motor overheating.

Three witnesses testified as to plaintiffs' credit history. Paul D. Honey, executive vice-president of the Carterville State and Savings

Bank, testified that the Carterville institution made numerous loans to plaintiffs and there was never a late payment on anything. Felicia Young, credit manager for both Wolohan Lumber and Lowe's, testified that she had personal knowledge of Mr. Norman's credit history in 1983 and 1984 and stated that he had an excellent payment record. Roger Heilman, first vice-president and managing officer of Chester Savings and Loan Association, stated that plaintiffs' credit history with Chester Savings and Loan was good.

Next, Tom Couch, president of Gentry Insurance in Carterville, and plaintiffs' independent insurance agent, testified. In January 1983, Gentry placed a policy for plaintiffs with Economy Fire and Casualty Company and in 1984 switched plaintiffs' insurance to Great American Insurance Company. Charles Norman did not specify the company or the type of policy that was to be acquired. The Great American Insurance Company policy had limits that were approximately $20,000 less than the Economy policy. He testified that he was familiar with the loss, and it did not exceed the coverage amount on the Great American policy. Mr. Couch testified he replaced the Economy policy with the Great American policy but he did not tell plaintiffs until after the fire occurred. Mr. Webb told him in late April 1984 that the examination of the refrigerator motor had been completed, and Webb had received a report. Webb told him that there were signs of internal shorting; however, defendant did not consider that to be the origin of the fire.

Mike Helfrich, a volunteer fireman, responded to the fire. The day after the fire, he went down to the Carterville fire department to help clean the truck. Mr. Davis was also at the fire station and said "that it looked to him like it was arson and asked me if the old boy would burn his house."

Larry Addison, a Carterville fireman, was called as an expert witness for plaintiffs. He was called to the scene of the fire and participated in bringing it under control. He received the call at his home on a fire monitor at 1:43 p.m. Upon arrival, there was a lot of burning debris that had fallen to the floor. As the fire fighters went through the living room, there were times that they broke a hole through the plywood on the floor. He described Charles Norman as being delirious, trying to get tools out, and dropping them. He remembered that there was a spot halfway down the living room and the kitchen that the fire would not go out. It was his opinion that the reason for the heaviest burn in the kitchen was because it was above the doors leading from the basement and since the wind was blowing from the south at 10 miles per hour, it blew through the doors and accelerated

the flames. In a location near where the television was sitting, he found a hole in the floor near a register and found that a wooden plug had come out of that hole. Additionally, the kitchen area of the house was the last area where the firemen were able to get to because they attacked the fire from the other side of the house and the kitchen "was allowed to burn the whole time we were there." He relied upon the opinion of Sam Davis, the heating and air-conditioning man, that the furnace ran for a period of time during the fire. Larry Addison stated that the pushing of the air through the furnace would accelerate the burn much as a blacksmith's bellows would do.

Larry Addison also compared several pictures of the refrigerator and the floor directly below the refrigerator and rendered his opinion that the refrigerator motor and fan were sitting directly over the charred area in the floor under the refrigerator. He also testified that he found the refrigerator motor to be seized, would not turn, which normally indicates internal heat, because most of the time an electric motor that has gone through a fire will still turn even though it is charred or burned. When he found the refrigerator motor to be seized, he looked in the area of the refrigerator and discovered the char pattern on the floor. He conducted a test for flammability of the vinyl-clad wallpaper. According to Mr. Addison, the paper burns very quickly and produces a large amount of black smoke.

Larry Addison also rendered his opinion that the refrigerator motor shorted out and created the fire because the only area under the refrigerator that was burned was directly under the motor itself, which was six or seven inches from the wall. Noting the high flammability of the wallpaper, he felt the motor caused sufficient heat to cause the fire, which traveled up the wallpaper and caught the wood cabinets and the vaulted ceilings on fire. He saw nothing in the house that would indicate to him that accelerants were used.

Larry Addison admitted that his first report, identified as defendant's exhibit 137, made no reference to the refrigerator or refrigerator motor being the cause and origin of the fire. That report is dated February 23, 1984. It was not until about two weeks after that date that he found, upon further investigation, that the refrigerator motor was the cause of the fire.

Rodney Bell also testified as a cause-and-origin expert for plaintiffs. He was not engaged by plaintiffs until August of 1985; therefore, he did not personally examine damage from the fire. His investigation was dependent upon photographs and evidence that were taken at the fire scene. Mr. Bell is the owner of Expertise, International, which does fire, arson, and explosive investigations. He esti-

mated that, on the average, he is asked to investigate one to three fires per week. He works primarily for insurance companies and law firms.

Mr. Bell testified that he submitted sample number 1, a piece of tile from the kitchen floor, to Dr. Pau, a Ph.D. analytical chemist who owns American Laboratories in North Carolina, for purposes of analyzing a graph that accompanied the sample to check for possible contaminants. Dr. Pau determined that the sample was negative. This was the same sample that tested positive by Barker & Herbert Analytical Laboratories. No control sample was taken of the tile. Mr. Bell testified that a control sample is extremely important. If a control sample is not taken, there is a possibility that the sample may come back positive due to the materials used in making the product.

Mr. Bell also examined defendant's exhibit 117, which was a piece of the main trunk line of the furnace ducting that had a pattern on it. He examined the actual duct work and rendered his opinion that the cause of the burn pattern could be the result of Freon or plastic rundown from the box of plastic toys above that area. He stated that there was no evidence that there was a flammable substance used in the duct work.

He also examined defendant's exhibit 100 and gave his opinion that the garage door was pulled down just prior to the picture being taken because there is still fiber glass pulled from another position. He stated that the debris is dropdown debris or water debris. According to the witness, if an accelerant had been involved, the aluminum in the door would have been melted and there was no sign of melting.

He also examined defendant's exhibit 113 and stated that a fireman may have stepped on that flooring above it and broken it down. He also gave the opinion that the discoloration was possibly caused by Freon, and when flammable liquids are involved with steel, the result is that the steel turns blue, not white. He also stated that defendant's exhibit 113 was not a point of origin of the fire. He also examined defendant's exhibit 96, which had a circular pattern which he believed was caused by record albums. These would be polyvinyl chloride and would burn very hot. Mr. Bell examined an aluminum threshold and stated that it was not uncommon at all to have aluminum thresholds melt, especially, as in the instant case, where there is a rubber seal in them.

He disagreed with the findings of David Schumann and testified the points of origin so identified by Mr. Schumann were the result of falldown of burning materials and other normal causative factors. The pine ceiling would burn and fall all over and that would be the source

of considerable burn in the kitchen area. He did agree with Mr. Addison that the refrigerator had been the point of origin. He had no opinion as to the involvement of the refrigerator independent of the opinion of Dr. Barbay, whom he worked with on this project. He did not know the temperature necessary to ignite the surrounding combustible materials from the motor of the refrigerator.

He further acknowledged that the fire would have produced various colors of smoke and much of the smoke would have been produced before the flames began coming out of the house. He noted that fire makes a loud noise when it burns combustible materials. In his opinion, it would have taken one to two hours for the fire to burn to the point as described by Mr. Norman when he first observed it at 1:30 p.m.

Following the jury trial, a bench trial was conducted on the issue of the imposition of penalties as provided by section 155 of the Code. (Ill. Rev. Stat. 1985, ch. 73, par. 767.) This court will discuss all facts of that hearing when the issue arises.

Defendant's first issue on appeal is whether the jury verdict was against the manifest weight of the evidence. Defendant argues that all of the physical evidence as reviewed and discussed by Mr. Davis, Mr. Milnes, Mr. Schumann, and Mr. Davie supports only one theory—that the fire was intentionally set and was the result of the use of accelerants. Defendant argues that plaintiffs' theory that the refrigerator motor was the cause of the fire is incredible and is not supported by the evidence. In light of this, defendant argues the trial court should have entered a judgment notwithstanding the verdict. Plaintiffs respond that the verdict was not against the manifest weight of the evidence, rather, it is the only rational verdict the jury could have reached. Specifically, plaintiffs point out that defendant's arguments are patently erroneous because defendant failed to acknowledge that it was defendant who had the burden of proof.

█▌ █ The party who asserts an affirmative defense has the burden of proving it. (*Pascal P. Paddock, Inc. v. Glennon* (1964), 32 Ill. 2d 51, 54, 203 N.E.2d 421, 423; *Capitol Plumbing & Heating Supply, Inc. v. Van's Plumbing & Heating* (1978), 58 Ill. App. 3d 173, 175, 373 N.E.2d 1089, 1091.) Thus, defendant has the burden of proving plaintiffs were guilty of misconduct in the origin of the fire in order to prevail on that branch of its affirmative defense and thereby defeat plaintiffs' claim to recover under the policy. (*Moore v. Farmers Insurance Exchange* (1982), 111 Ill. App. 3d 401, 444 N.E.2d 220.) Additionally, in order to prevail defendant must prove (1) that the fire was of an incendiary nature, (2) that plaintiffs caused or procured the fire,

and (3) motive. (111 Ill. App. 3d at 409-10, 444 N.E.2d at 225-26.) Where a crime such as arson is an issue in a civil action, it need only be proved by a preponderance of the evidence rather than beyond a reasonable doubt. *Werner's Furniture, Inc. v. Commercial Union Insurance Co.* (1976), 39 Ill. App. 3d 59, 65, 349 N.E.2d 616, 621.

We agree with plaintiffs that defendant did not address the burden of proof issue, *ergo*, defendant's argument that the jury verdict is against the manifest weight of the evidence is fatally flawed. The testimony did not establish by a preponderance of the evidence that the fire was of an incendiary nature. While there was a great deal of testimony that accelerants were the cause of this fire and that there were six separate, noncommunicated points of origin, all this evidence was presented by experts retained by defendant. Standing alone, this evidence was not without flaws. For example, no control sample was taken of the tile in the kitchen which tested positive by defendant's expert for fuel oil residue. Additionally, David Schumann, expert for defendant, did not know the locations of items of furniture in the living room, of what the materials used in the ceiling of the kitchen and living room were made, and what was in the bedroom closet underneath of which was described as a separate point of origin. Curt Davis, also retained by defendant, admitted that at some point he found out that there was kerosene in the kitchen but did not have any particular concern about it and did not tell Hoyle and Associates about it. On the other hand, plaintiffs presented evidence that the refrigerator motor was the cause of the fire. Two of the experts retained by plaintiffs, Dr. Joseph Barbay and Rodney Bell, were not even retained until August 1985, a year-and-a-half after the fire. They did not have the benefit of seeing the residence after it initially burned. Instead, they had to rely on photographs taken of the scene.

Further investigative testimony came from Larry Addison and Barney West. Both witnesses performed unbiased investigations. Larry Addison, a fireman and arson investigator for the Carterville fire department, concluded that the refrigerator motor was the cause of the fire. He stated that he saw nothing in plaintiffs' house that would indicate to him that accelerants were used. Additionally, Barney West, a special agent with the arson bureau of the State Fire Marshal's office at the time of the fire, testified that in his opinion the fire ignited from the junction box above the utility room. He found no evidence of the use of accelerants. Mr. West was proud of his record of convictions for arson. He boasted that in 1982, 23 of 69 downstate convictions for arson were made through his investigations.

■ We acknowledge that the burden of proof in an arson criminal

case is greater than the burden of proof required in a civil case with an affirmative defense of arson. (*Werner's Furniture, Inc. v. Commercial Union Insurance Co.* (1976), 39 Ill. App. 3d 59, 349 N.E.2d 616.) However, we believe that had Mr. West or Mr. Addison found any evidence that the fire was of an incendiary nature, he would have discussed this during his testimony. Larry Addison agreed that initially the fire looked suspicious. There were several hot spots that could not be extinguished. It was only through a thorough investigation that Mr. Addison was able to rule out arson as a possibility. By the end of his investigation, he had natural explanations for these six separate noncommunicated points of origin. In our estimation, defendant's investigation was not as thorough.

■ Initially, defendant took the view that plaintiffs burned their own house. This is evidenced by the statements of Curt Davis to Mike Helfrich, a volunteer fireman, the day after the fire. Mike Helfrich testified that Davis said to him "that it looked to him like it was arson and asked me if the old boy would burn his house." Once arson was established as a possibility, defendant seemed to look only for clues to support this theory. We believe that an insurer owes an insured more. An insurer should investigate every theory before labeling a fire as arson. Only after all other theories have been ruled out should an insurance company deny an insured's claim.

■ Defendant made a better case in establishing that Mr. Norman had the opportunity to cause or procure the fire. Opportunity for starting a fire, as well as the identity of the person starting the fire, may be proven by circumstantial evidence. (*People v. Brown* (1982), 104 Ill. App. 3d 1110, 433 N.E.2d 1081.) Only the two plaintiffs had keys to the house. One of the few things that the experts agreed upon at trial was the length of time it would take the house to be in the advanced stage of fire that it was found in. All experts agreed that it would take at least one hour to develop to the point as discovered by Mr. Norman at 1:30 p.m. Additionally, all experts agreed that a burning house would create both smoke and loud noise. For these reasons, defendant argues the fire had to be detectable by Charles Norman prior to the time he announced it.

Mr. Norman was by his own admission last in the house at 11:30 a.m. He then worked on a tractor, attempting to get it unstuck from the mud. He was 150 to 200 feet away from the house while doing this. After several unsuccessful attempts to get the tractor unstuck, he went to his neighbor's home to borrow an empty five-gallon gas can. He then ran a few errands in town, including filling up the five-gallon gas can, and drove back to his residence. For the next 5 to 10

minutes he again worked on getting the tractor unstuck. He then left for another 15 to 20 minutes and upon his return found the house was on fire with flames coming out of the soffit on the second level in the area of the eaves at the kitchen. Mr. Norman did not mention that anyone other than his wife, who left at 7:30 a.m., was present at his home on February 10, 1984, prior to the fire.

Mr. Norman's own testimony was such that he was the only person who was on the premises who would have had the opportunity to start the fire if it had been one of incendiary nature which, as stated earlier, we do not believe was proven by a preponderance of the evidence. We also note that Mr. Norman appears to be an intelligent man. He runs his own construction company which was at least mildly successful, as plaintiffs had no major outstanding debts other than their mortgage.

Most importantly, there is absolutely no evidence that Mrs. Norman had anything to do with this fire. Plaintiffs' exhibit 53, which was not introduced until the penalty portion of the trial and which the jury did not see, was a memo from Joe Webb to John Jones, both employees of defendant. It stated in part, "At this time we do not feel that Mrs. Norman had anything to do with the fire." It also stated, "We are at this time investigating as to what our liability could be to her." Still, defendant denied Mrs. Norman's claim.

Finally, defendant argues that plaintiffs had a financial motive because, as noted, the policy of insurance was for replacement cost and provided coverage up to the extent of $145,000. Plaintiffs had initially invested approximately $30,000 of their own money in order to start building their home. Additionally, they had a $70,000 mortgage through Chester Savings and Loan. At the time of the loss, plaintiffs were in the process of changing insurance from their former company, Economy, to defendant. Defendant argues that plaintiffs knew that they had both an existing policy with Economy to pay off their mortgage and a replacement cost policy with defendant. There is absolutely nothing in the record that would indicate that plaintiffs had any knowledge of an existing policy with Economy as well as a replacement cost policy with defendant. On the contrary, Tom Couch, plaintiffs' insurance agent, testified that he terminated plaintiffs' policy with Economy Insurance and initiated a policy on behalf of plaintiffs with defendant. The replacement cost policy was selected by Tom Couch, not plaintiffs, as a matter of procedure in Couch's office. According to Couch, plaintiffs did not know until after the fire that they were covered by defendant. Still, defendant argues that defendant's policy alone was incentive enough for plaintiffs to burn their own home.

■ With defendant's coverage of replacement cost up to $145,000 and an initial investment of $30,000, plaintiffs would stand to gain $115,000 in profit, according to defendant. What defendant failed to consider is that plaintiffs still owed the balance of their $70,000 mortgage. So rather than gaining $115,000, plaintiffs would only stand to gain approximately $45,000 after they paid their mortgage. Additionally, they would be without a home and all of their personal items that they had accumulated both throughout their individual lives and throughout their marriage. Both plaintiffs testified that they would most miss the baby pictures of their children. Such mementoes are irreplaceable. Mrs. Norman testified as to the loss of a bedroom set which she had received from her husband, as well as other special gifts bought or made for her. Mr. Norman testified to the loss of his stereo equipment and 600-album record collection of which he was extremely proud. There was testimony about the work plaintiffs had been doing on their taxes. All of their receipts from the year as well as the initial work completed on their tax forms vanished with the fire. Plaintiffs were left without so much as a toothbrush. We do not believe that the lure of $45,000 is so great as to warrant a couple burning their home, especially in light of the fact that plaintiffs were not in financial distress and they had completed most of the work on this home themselves.

Defendant did not offer one witness to testify that plaintiffs were in bad financial condition. On the other hand, plaintiffs offered three witnesses that testified that not only were plaintiffs current on all payments, but also that they were considered a good financial risk within their community. Plaintiffs themselves testified that they had no other large outstanding debts other than their mortgage. Plaintiffs also testified to the painstaking work that they put into building this home. We find that there is absolutely no showing of financial motive on the part of plaintiffs to burn down their own home.

Defendant clearly did not meet its burden of proof in this case. Even employees of defendant were concerned about defendant meeting its burden of proof. On August 16, 1984, John Jones, a staff manager in defendant's home office, related in a memorandum that he was concerned that defendant had based a substantial amount of its reasoning on mere supposition. He questioned whether the company had firmly established any of the three prerequisites of arson: accelerants, opportunity, motive. Again, this memo was not discussed until the penalty portion of the trial, so the jury did not see it.

In the case before us, we are dealing with the verdict of the jury reached after hearing all the evidence and approved by the trial

judge, who denied motions for a new trial and a judgment notwithstanding the verdict. Defendant argues that it is entitled to a judgment *n.o.v.* based on what defendant characterized as the uncontradicted testimony of Barker Davie and Richard Kragh as to the temperature the electrical motor would have produced if the bearing seized. Defendant argues that these witnesses' testimony that the temperature of this motor could have only reached 302° Fahrenheit, upon seizing, makes plaintiffs' theory that the refrigerator motor caused the fire impossible. However, it was the explanation of plaintiffs' experts Barbay and Bell that the temperature of the motor could increase to cause a fire if it had merely slowed down, not stopped. We further note that plaintiffs do not carry the burden of establishing how the fire started; defendant has the burden of establishing arson.

■■ ■ Assuming, *arguendo,* that the motor could have only reached a temperature of 302° Fahrenheit, this evidence goes to determine how the fire originated and does not satisfy defendant's burden of proof on the arson defense. This evidence alone would be insufficient for us to grant a judgment notwithstanding the verdict. Defendant is entitled to a judgment notwithstanding the verdict only in those cases in which all of the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors the movant that no contrary verdict based on that evidence could ever stand. (*Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 229 N.E.2d 504.) We cannot say that the evidence here, when viewed in the light most favorable to plaintiffs, so overwhelmingly favors defendant that this verdict cannot stand. Consequently, we conclude that the trial court properly denied the motions of defendant for directed verdict and for judgment notwithstanding the verdict.

Defendant's second contention is that the trial court committed errors in rulings on the admission of evidence and law warranting a new trial. First, defendant argues that the testimony of a defense witness, Anthony Pulgine, regarding the basis for declining the claim was improperly limited. Defendant argues that plaintiff's cross-examination regarding various types of reports in the claims file should not have been allowed. Plaintiffs cross-examined Pulgine by asking him if anything in the insurance report supported the argument that plaintiffs had a financial motive to burn their home. When Pulgine answered that statements by plaintiffs reflected such a motive, plaintiffs objected, and the court sustained the objection. Defendant argues this was error for two reasons: (1) it allowed plaintiffs to go beyond the scope of direct examination, and (2) once the matters were raised, the

court compounded the error by not allowing defendant to complete redirect. Plaintiffs reply that cross-examination of Pulgine was without error because the matters discussed were raised specifically by defendant on direct examination. The transcripts are out of sequence, and once in sequence, this becomes clear. Plaintiffs additionally respond that the trial court was correct in disallowing defendant to bring up plaintiffs' mortgage during redirect because it had not been discussed during cross-examination.

■ The scope of cross-examination is limited to the subject matter of direct examination and matters affecting credibility of witnesses. (*People v. Van Dyke* (1953), 414 Ill. 251, 111 N.E.2d 165.) However, prejudice is required in order to permit reversal of the trial court's allowance of cross-examination beyond the scope of direct. *Muscarello v. Peterson* (1960), 20 Ill. 2d 548, 170 N.E.2d 564.

■ After close examination of the record, it becomes obvious that the transcripts are out of sequence. In volume 2 of the transcripts at R.587, the examination of Barker Davie was completed and the trial court recessed for February 2, 1987. The next page in volume 2, R.588, shows the court reconvening on February 3, 1987, and it appears as though Anthony Pulgine just began to testify. This is not what occurred. In fact, as shown in volume 4 of the transcripts at R.1511, a different court reporter reported the beginning portion of that day. Chronologically, the record should have R.1511 through R.1566 of volume 4 inserted between pages R.588 and R.589 of volume 2. We find the argument of defendant that plaintiffs went beyond the scope of direct is without merit in light of confusion created by the transcripts. Once in order, it is apparent that there was no prejudice against defendant by virtue of plaintiffs' cross-examination of Anthony Pulgine. Defendant inquired into these same issues at length at a different point in the trial transcript.

■ We move next to the issue of plaintiffs' mortgage and whether on redirect defendant should have been able to elicit responses about the mortgage. Redirect examination is generally limited to the scope of the preceding cross-examination; scope of further examination is within the discretion of the trial court. (*City of Chicago v. Brown* (1978), 61 Ill. App. 3d 266, 377 N.E.2d 1031.) From the record, it appears that on cross-examination, Pulgine was questioned only about materials in the *file* which were the basis for denying plaintiffs' claim. On redirect, Pulgine's answer to questions about evidence of financial motive relied on plaintiffs' mortgage with Chester Savings and Loan:

"Q. Is there anything other than the document of the report

that supports financial motives?

A. Yes, sir, there would be.

Q. And what is that?

A. There is a statement of both Mr. and Mrs. Norman in the file, both recorded statements, sworn statements, wherein they indicate that it was their impression there was coverage for both the mortgagee and the insured on the policy."

At this point, plaintiffs' attorney objected. Plaintiffs' main contention was that this went beyond the scope of direct and that defendant had moved to keep out any mention of plaintiffs' mortgage from the jury in a motion *in limine* filed January 27, 1987. While the motion *in limine* was never ruled upon, the trial judge sustained plaintiffs' objection. No offer of proof was made.

██ We believe the trial court was within its discretion in disallowing the testimony as to the mortgage on redirect, especially in light of the fact that defendant had moved to keep mention of plaintiffs' mortgage from the jury before trial. Additionally, since no offer of proof was made, we have no way of knowing what would have been stated had Pulgine been allowed to expand upon his answer.

Second, defendant argues that it was error not to allow Pulgine to render an expert opinion on the declination of plaintiffs' claim. Joe Webb was originally disclosed as defendant's expert. Webb was unavailable to testify due to stroke-like symptoms. Defense counsel advised plaintiffs' counsel that Pulgine would testify in lieu of Webb. Plaintiffs took a discovery deposition of Pulgine on January 21, 1987, and defendant argues plaintiffs posed the very same question to Pulgine, to which plaintiffs now object. Defendant argues that although Pulgine was not identified in a pleading response to Rule 220 interrogatories, the spirit of the rule was followed in that an expert witness was identified and plaintiffs were given the opportunity to depose that person.

██ ██ Supreme Court Rule 220(b)(1) requires the disclosure of an expert witness at the latter of either the first pretrial conference or 90 days after the substance of his expert opinion is known to the party who intends to introduce such witness. The rule further provides that failure to disclose an expert as required will result in disqualification of the expert. (107 Ill. 2d R. 220(b)(1).) The trial court may impose sanctions, and the court's discretion should not be interfered with on review absent a clear showing of abuse. (*Romano v. Bittner* (1987), 157 Ill. App. 3d 15, 510 N.E.2d 924; *Fischer v. G & S Builders* (1986), 147 Ill. App. 3d 168, 497 N.E.2d 1022; 107 Ill. 2d R. 219.) Several courts have rejected defendant's argument that so long

as there is no surprise and plaintiffs are allowed to depose, the expert should be considered disclosed. (*Fischer*, 147 Ill. App. 3d 168, 497 N.E.2d 1022; *Beasley v. Huffman Manufacturing Co.* (1981), 97 Ill. App. 3d 1, 422 N.E.2d 241; *Fultz v. Peart* (1986), 144 Ill. App. 3d 364, 494 N.E.2d 212.) Because of such precedent, we find the trial court did not abuse its discretion in excluding Pulgine's testimony as an expert.

Third, defendant argues that the trial court erred by allowing Larry Addison to testify as an expert and then compounded the error by prohibiting defendant from cross-examining on whether Addison considered himself an expert. Defendant gives no reason why Addison should not be considered an expert other than Addison's own statements during his discovery deposition in which he declined to call himself an expert. Counsel for plaintiffs asked Addison during direct examination if he had an opinion based upon his experience, training, and expertise in the area of fire investigation and cause and origin as to various matters to which the defendant objected for the reason that Addison had testified in his discovery deposition that he was not an expert as to cause and origin. This objection was overruled. Then, during cross-examination, defense counsel posed the question, "At the time of the fire and during the period you investigated, sir, did you feel that you were an authority on fires?" Plaintiffs objected. The court sustained. Next, the question was posed, "Have you made the statement in the past that you do not feel that you are an authority—," to which an objection was sustained and the court instructed the jury to disregard the statement. In response to the court prohibiting this cross-examination of Mr. Addison, defendant made an offer of proof.

"Q. Mr. Addison, isn't it correct that you do not consider yourself to be an authority on fires?

A. One of the first things they tell us in arson investigation class is not to label yourself as an expert or authority but to present your credentials and your training experience and let the courtroom and the judge and the jury make that decision for themselves.

Q. Sir, did you testify in your discovery deposition that you were not authority on fires?

A. There was no one there to make that decision other than myself, so I said I was no authority.

Q. It is correct you stated that?

A. I stated that.

THE COURT: Does that conclude your offer of proof?

ATTORNEY FERRELL: No, sir, I have one other short question.

Q. And isn't it correct that you also stated in your discovery deposition that you don't consider yourself a cause and origin expert to which you said true? Did you state that?

A. The above reasons that I mentioned I do not term myself an authority or an expert but I will leave that up to the discretion of the jurors and the judge."

Defendant sought to place this testimony before the jury on the basis that it concerned Mr. Addison's credibility.

■■■ ■ Whether a witness is competent to give an expert opinion is a question of fact for the trial judge and is subject to review only upon a showing of a clear abuse of discretion. (*Schwartz v. Alton & Southern Ry. Co.* (1976), 38 Ill. App. 3d 528, 347 N.E.2d 829.) It is the trial judge, not the witness, who has responsibility and discretion to determine whether a witness is qualified as an expert. (*Lolie v. Ohio Brass Co.* (7th Cir. 1974), 502 F.2d 741.) In the instant case, the trial court erred in not allowing the above-described cross-examination, since it related to the witness' credibility and was within the scope of proper cross-examination of an expert witness. (See *Tenenbaum v. City of Chicago* (1975), 60 Ill. 2d 363, 325 N.E.2d 607; *Sanchez v. Black Brothers Co.* (1981), 98 Ill. App. 3d 264, 423 N.E.2d 1309.) However, examining this ruling in the context of the trial as a whole, we deem it to be harmless error.

Fourth, defendant argues that the trial court erred in failing to strike the testimony of Joseph Barbay and compounded the error by precluding complete cross-examination of Barbay. Defendant contends that Barbay's opinions were based on a possibility and not on a scientific degree of reasonable certainty and thus should have been stricken. Defendant offers transcript as evidence that the trial court prevented defendant from exercising its full right of cross-examination.

Several times during cross-examination, defense counsel sought to get Dr. Barbay to agree that his opinions were "possibilities." After reading the transcript, we find that Dr. Barbay's speculation was not if there was a fire in the motor, which he clearly stated there was, but rather how the fire in the motor began. Barbay did give several explanations as to how the fire could have started; however, he was clear in stating that there had been a fire *in* the refrigerator motor, not external of the motor.

■■■ ■ Couching a question or answer in terms of possibility or probability does not automatically render the question or answer inad-

missible, or improper, nor does it constitute reversible error. (*Presswood v. Morris* (1979), 70 Ill. App. 3d 513, 388 N.E.2d 844.) So long as an expert witness is not called upon to decide any controverted fact but is asked to assume the truth of the facts testified to, he may give an opinion thereon in any form. (*Clifford-Jacobs Forging Co. v. Industrial Comm'n* (1960), 19 Ill. 2d 236, 166 N.E.2d 582.) As stated in *Beloit Foundry v. Industrial Comm'n* (1976), 62 Ill. 2d 535, 539, 343 N.E.2d 504, 506, where the court considered the expert opinion of a physician regarding the cause of death:

> "He may testify to 'what might' have caused a death or injury, despite any objection that his testimony is inconclusive and speculative. The testimony is but the opinion of the witness given on facts assumed to be true. It is for the trier of fact to determine the facts."

Dr. Barbay testified positively that a fire occurred internally in the refrigerator motor. Because he could not state with absolute certainty precisely how the fire started does not render his testimony conjectural and, thereby, inadmissible.

Defendant cites *Simon v. Lumbermens Mutual Casualty Co.* (1977), 53 Ill. App. 3d 380, 368 N.E.2d 344, and *Sommers v. American Economy Insurance Co.* (1972), 8 Ill. App. 3d 450, 289 N.E.2d 712, to support its theory that an expert may not express an opinion which is based upon conjecture, guess, speculation, or surmise. In both *Sommers* and *Simon*, the decedents were sitting in cars and had accidents in which their cars received only minimal damage. When first observed after impact, both decedents were found gasping for breath and slumped behind the steering wheel. Both died shortly thereafter. In *Sommers*, the doctor who had treated the decedent for his heart condition was given a hypothetical situation and asked if he had an opinion within a reasonable degree of medical certainty as to the cause of death. The doctor stated, "he possibly died of a heart attack." He felt there "possibly could be" a causal connection between the accident and the heart attack. This doctor was not at the scene, he did not pronounce the decedent dead, and there was no autopsy performed. The appellate court found that the doctor's statements left no doubt that his opinion was based upon guess and conjecture and that it was properly stricken from the record. In *Simon*, the physician who treated the decedent for high blood pressure prior to his death, but who was not on the scene when the decedent collapsed and who never viewed the decedent's body before signing the death certificate, was found not to provide an adequate basis to say whether the collision caused the decedent to have a heart attack or whether the dece-

dent's heart attack caused the collision. It was found that the physician's opinion that the trauma resulting from the collision might have caused the decedent to suffer a heart attack was mere speculation and conjecture and was properly stricken. There was no such guessing by Dr. Barbay. He testified as to the observed condition of the motor and his positive opinion that the fire was internal rather than external. He then gave his opinion as to how the fire may have escaped from the motor.

Defendant next contends that with respect to Dr. Barbay's testimony, the trial court invaded the province of the jury by requiring defendant to cease alleged repetitive questioning. The trial court's actions concern two questions posed by defense counsel. The first question concerned whether Dr. Barbay was discussing this particular motor or the entire class of impedance-protected motors. The second question concerned whether Dr. Barbay's opinion was based upon theory.

■■■ In conducting a trial, the trial judge must be impartial, and while he must be careful not to influence the jury, he may forbid repetitious questions and may question witnesses. (*People v. Rosenborgh* (1974), 21 Ill. App. 3d 676, 315 N.E.2d 545.) After reviewing the record, we find that both questions were answered fully, and that the trial court was correct in pointing out that the questions had been asked and answered. The offer of proof made in response to the trial court's intervention brings up no new evidence, but covers testimony already in evidence. In a trial of some length such as the case at bar, a trial judge must use such tactics to keep the trial running smoothly.

Finally, defendant also complains of an intervention by the trial court in response to defendant's question concerning the title of "Doctor" held by Joseph Barbay:

"Q. Now, isn't it also correct, Dr. Barbay, you are not a medical doctor, that is a title you have at the university, isn't it?

A. Yes, sir.

Q. Isn't it correct, Dr. Barbay,—.

THE COURT: Excuse me, this is not a university title exactly, it is a degree that you have earned, is it not, sir? Ph.D.?

A. It is an earned Ph.D. from the University of Missouri in Electrical Engineering."

■■■ Again it is important to note that the trial judge must be impartial and must be careful not to influence the jury, but he may question witnesses. While the trial court must permit defense counsel to cross-examine witnesses, he must also expedite proceedings. (*People v. Rosenborgh* (1974), 21 Ill. App. 3d 676, 315 N.E.2d 545.) While de-

fense counsel was attempting to impeach Dr. Barbay, the trial judge was trying to expedite proceedings and clarify how Dr. Barbay received his title. The overall conduct of the trial was fair.

We now address defendant's final contention that the judgment of the trial court in assessing penalties under section 155 of the Code (Ill. Rev. Stat. 1985, ch. 73, par. 767) was contrary to the manifest weight of the evidence. The court considered both the evidence presented to the jury and the following evidence offered at the section 155 hearing.

Anthony Pulgine was called by plaintiffs as an adverse witness pursuant to section 2—1102 of the Code of Civil Procedure (Ill. Rev. Stat. 1983, ch. 110, par. 2—1102). Mr. Pulgine stated that plaintiffs directed two letters to defendant regarding the status of their claim, one dated March 27, 1984, and a second dated June 2, 1984, neither of which was answered by defendant. Defendant responded with a letter of declination of the claim on June 26, 1984. Other than the non-waiver and reservation of rights signed by plaintiffs four days after the loss, Pulgine did not recall any explanation for the delay in resolving the claim. The reason for the denial and rejection of plaintiffs' claim was that defendant contended plaintiffs intentionally set fire to their residence and provided defendant with a proof of loss which fraudulently misrepresented the loss. Furthermore, defendant believed plaintiffs had a financial motive to burn down their house in that they had a replacement cost policy and an additional loss policy clause with Economy Fire and Casualty Company. However, Mr. Pulgine admitted that defendant had no report, expert or otherwise, that stated plaintiffs had a motive to set fire to their home. He admitted that on August 16, 1984, John Jones, staff manager in defendant's home office, was quite concerned that defendant had based a substantial amount of reasoning on pure supposition. Jones also questioned whether defendant had firmly established any of the three prerequisites of arson. Plaintiffs' exhibit 52, a memorandum from Jones to Joe Webb dated September 27, 1984, was admitted. It stated that Mrs. Norman may or may not have had any part in the fire and that the report on the refrigerator motor and the information that defendant had was not forwarded to the insured or the firemen who suspected it. Plaintiffs' exhibit 53, a memo from Webb to Jones, stated in part, "At this time we do not feel that Mrs. Norman had anything to do with the fire." It also stated, "We are at this time investigating as to what our liability could be to her."

Mr. Pulgine admitted that both at the time of the loss and at trial defendant was aware of the rule of law known as the "innocent

spouse" or "innocent coinsured rule," but treated plaintiffs as one entity under the policy. He also admitted that defendant had nothing that would indicate that Susan Norman had anything to do with setting the fire, and that for the holder of a replacement cost policy to get full value of the policy, the holder must have the home completely replaced. However, since the home was almost brand new, the actual cash value would have been approximately the same amount as the replacement cost value. Mr. Pulgine testified that it was his opinion as to the custom and practice of the insurance industry that the handling of plaintiffs' claim by defendant was not vexatious or unreasonable and that it was handled completely in accordance with established industry practice and standards.

Plaintiffs next called Tom Couch, their insurance agent. He personally observed the actions of defendant, its agents, employees, and independent contractors who were working on the handling of plaintiffs' claim. He rendered his opinion that defendant did not act in good faith in handling plaintiffs' claim. He also stated that he did not believe defendant had acted reasonably in handling the claim. This opinion was based primarily on the failure of defendant to fully explore credible conflicting evidence. In addition, he felt that defendant failed to support a theory of financial distress or financial motive. Further, he stated that there was an unreasonable delay in handling the file and in arriving at the denial of the loss because defendant did not act on the proof of loss within 60 days, as provided by defendant's policy.

On cross-examination, Mr. Couch testified that the extent of his authority to adjust claims is $2,500. Additionally, he is not a cause-and-origin expert and he has never consulted with a cause-and-origin expert during his adjusting experience.

Curt Davis testified for defendant that two or three weeks after the fire Larry Addison told Davis he had a theory about the refrigerator motor causing the fire. Davis did admit that he received this information from Larry Addison the night before he sent out his detailed report to defendant. He took no further action on plaintiffs' file for many weeks thereafter.

John Jones, staff manager of claims for defendant, testified that on August 16, 1984, he was concerned that the file did not establish plaintiffs' financial motive on the part of plaintiffs. He admitted that a motive of the insureds is one of the generally accepted standards for denial of the claim on the basis of arson.

In rebuttal, both plaintiffs testified that at the time of their loss they did not know there was a potential second policy of insurance

which might provide overlapping coverage.

After hearing such evidence and considering the evidence presented to the jury, the trial court found that defendant's failure to pay plaintiffs' claim was both unreasonable and vexatious. Accordingly, the trial court ordered defendant to pay plaintiffs $62,755 as attorney fees, $17,483.60 as costs, and $25,000 as a statutory penalty.

We first consider defendant's argument that the trial court erred by permitting evidence of events subsequent to the date of declination. Prior to the bench trial portion of this matter, defendant presented a motion *in limine* seeking to prohibit any evidence of action or activities of the insurer subsequent to the date of declination. This motion was denied, and plaintiffs were allowed to introduce certain letters and memoranda written subsequent to the date of declination. Defendant argues that the trial court's ruling was wrong for two reasons: (1) any matters that occurred post-declination are irrelevant and improper since the insurer's conduct should be measured by the knowledge it had and actions it took only up to and including the date of declination, and (2) once the matter is in litigation, correspondence and memoranda that developed thereafter are privileged communications and, therefore, are inadmissible. We hold that post-declination letters and memoranda are relevant and admissible.

In determining whether defendant was vexatious and unreasonable "the totality of the circumstances, taken in broad focus, will determine the matter and the trial court's discretion will not be disturbed, unless it can be shown to have been abused." (*Deverman v. Country Mutual Insurance Co.* (1977), 56 Ill. App. 3d 122, 124, 371 N.E.2d 1147, 1149.) The court may consider that the insured was forced to file suit to recover. (*Fassola v. Montgomery Ward Insurance Co.* (1982), 104 Ill. App. 3d 825, 433 N.E.2d 378.) In *Fassola,* evidence of the original settlement offer made to the plaintiff by the defendant as well as subsequent settlement offers were held to be admissible. So, too, was a letter written by the defendant to the plaintiff after suit had been filed in which a reasonable offer was conveyed. Other cases in which there was a section 155 hearing have also allowed evidence subsequent to the date of declination and subsequent to the initiation of litigation to be admitted. *Mohr v. Dix Mutual County Fire Insurance Co.* (1986), 143 Ill. App. 3d 989, 493 N.E.2d 638; *Perschall v. Metropolitan Life Insurance Co.* (1983), 113 Ill. App. 3d 233, 446 N.E.2d 570.

Defendant cites *People ex rel. Fahner v. Colorado City Lot Owners & Tax Payers Association* (1982), 108 Ill. App. 3d 266, 438 N.E.2d 1273. The facts in *Fahner* are readily distinguishable from the

case at bar. In *Fahner*, the issue was whether the defendant was guilty of criminal contempt, an act which is not ongoing as compared to the denial of the insurance claim.

We now consider defendant's contention that the trial court's finding that defendant's refusal to pay plaintiffs' claim constituted vexatious and unreasonable conduct within the meaning of section 155 of the Code (Ill. Rev. Stat. 1983, ch. 73, par. 767) is against the manifest weight of the evidence and the court abused its discretion in imposing penalties. Defendant argues that its denial of plaintiffs' claim was made in good faith. Section 155 provides, in pertinent part:

> "In any action by or against a company wherein there is in issue the liability of a company on a policy or policies of insurance or the amount of the loss payable thereunder, or for an unreasonable delay in settling a claim, and it appears to the court that such action or delay is vexatious and unreasonable, the court may allow as part of the taxable costs in the action reasonable attorney fees, other costs, plus an amount not to exceed any one of the following amounts:
>
> (a) 25% of the amount which the court or jury finds such party is entitled to recover against the company, exclusive of all costs;
>
> (b) $25,000;
>
> (c) the excess of the amount which the court or jury finds such party is entitled to recover, exclusive of costs, over the amount, if any, which the company offered to pay in settlement of the claim prior to the action." (Ill. Rev. Stat. 1985, ch. 73, par. 767.)

The question of vexatious and unreasonable delay is a factual one, which must be based upon an assessment of the totality of the circumstances, taken in broad focus. (*Fassola v. Montgomery Ward Insurance Co.* (1982), 104 Ill. App. 3d 825, 832, 433 N.E.2d 378, 383.) Neither the length of time, the amount of money involved, nor any other single factor taken by itself is controlling in determining if a delay is vexatious or unreasonable. It is the attitude of the defendant which must be examined. (*Deverman v. Country Mutual Insurance Co.* (1977), 56 Ill. App. 3d 122, 124, 371 N.E.2d 1147, 1149.) Attorney fees and penalties are not awarded simply because the insurer refuses to settle or was unsuccessful in litigation. Black's Law Dictionary, defines vexatious as "[w]ithout reasonable or probable cause or excuse." (Black's Law Dictionary 1403 (5th ed. 1979).) The applicable standard of review would permit reversal only if we find that the trial court

abused its discretion. (*Songer v. State Farm Fire & Casualty Co.* (1980), 91 Ill. App. 3d 248, 414 N.E.2d 768; *Deverman v. Country Mutual Insurance Co.* (1977), 56 Ill. App. 3d 122, 371 N.E.2d 1147.) We find there is sufficient support for the trial court's determination of vexatious and unreasonable delay to preclude finding an abuse of discretion on review.

▮▮ After reviewing the record, it is apparent that the trial court's primary reasons for finding unreasonable or vexatious delay was because of delays in discovery and trial. The way defendant tried the case was also found to be unreasonable. The trial court specifically pointed to Mr. Webb's absence from trial as being unreasonable due to Webb's vital role in the denial of this claim. It must be noted that these two reasons were not the only reasons given by the trial court for finding an unreasonable and vexatious denial, but they were given great weight.

As pointed out in the facts, there were some delays in both discovery and trial settings that were attributable to defendant. However, defendant rightly pointed out in his brief that all continuances were approved by the court. While we believe that delays during litigation can be considered in the totality of circumstances, the delays in the instant case were not unreasonable. The fire occurred on February 10, 1984, and the trial began in late January 1987. Considering the complexity of this case, we find that the time frame for discovery, pretrial motions and trial was quite reasonable.

Defendant throughout the trial and the penalty hearing was well represented by able and vigorous counsel. The trial court's suggestion to the contrary is not supported by the record. Furthermore, the fact that the jury's verdict was for plaintiffs does not by itself indicate inadequate or improper representation; juries are instructed to base their decisions on the evidence presented at trial, not the actions of counsel. (Illinois Pattern Jury Instructions, Civil, No. 1.01 (2d ed. 1971).) Defense counsel's trial strategies and their execution were a legitimate exercise of his professional judgment, and courts should refrain from penalizing a lawyer or his client for such exercise of judgment absent a violation of applicable rules of ethics or procedure or the attempted obstruction or deliberate delay of the judicial process. Absent those circumstances, strategies and tactics of trial counsel are not an adequate basis for imposition of penalties under section 155 of the Code. Ill. Rev. Stat. 1985, ch. 73, par. 767.

Likewise, we cannot say that Webb's nonappearance was unreasonable. The record is clear that Mr. Webb had suffered stroke-like symptoms in early January 1987, and had not completely recovered at

the time of trial. There was absolutely no evidence that Webb's absence was due to concealment by defendant, yet the trial court insinuated as much. As demonstrated by the trial court's ruling, much weight was given to perceived delays in litigation and the absence of Webb as reasons for finding an unreasonable and vexatious delay and for imposing penalties. Because we find that neither reason noted above, alone or in combination, meets the standard for unreasonable and vexatious delay, we must find that the trial court's articulated reasons for imposing penalties under section 155 were an inadequate basis for the exercise of its discretion.

Defendant's handling of plaintiffs' claim, however, suffers major infirmities. There was no adequate explanation of motive on the part of defendant's experts to support a theory of incendiary origin, and, as stated earlier, defendant's investigations were flawed. Investigations by disinterested parties, *i.e.*, the Carterville fire department and the State Fire Marshal's office, ruled out arson as a possibility. Defendant's delay in denying plaintiffs' claim for 111 days is unreasonable, especially in light of letters written to defendant by both plaintiffs and plaintiffs' mortgagee inquiring as to the status of the claim. Defendant had absolutely no evidence at any time to connect Susan Norman with the fire, yet the entire claim was denied. See *Economy Fire & Casualty Co. v. Warren* (1979), 71 Ill. App. 3d 625, 390 N.E.2d 361; *West Bend Mutual Insurance Co. v. Salemi* (1987), 158 Ill. App. 3d 241, 511 N.E.2d 785; *Schultz v. Republic Insurance Co.* (1984), 124 Ill. App. 3d 342, 464 N.E.2d 767.

Defendant contends that Anthony Pulgine testified during the hearing that the handling of this claim was within the accepted industry custom and practice. Looking to the record as a whole, however, the evidence presented an adequate factual basis for the trial court's award of attorney fees, costs, and punitive damages under section 155 of the Code. (Ill. Rev. Stat. 1985, ch. 73, par. 767.) Even though the court might have reached a different conclusion on the basis of evidence presented, that is not the standard by which the alleged error is reviewed. The record reveals no abuse of discretion when examined in its entirety.

For the foregoing reasons, the judgment of the circuit court of Williamson County is affirmed.

Affirmed.

RARICK and CHAPMAN, JJ., concur.